United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ESC-TOY LTD.,<br><br>                    Plaintiff,<br><br>          v.<br><br>SONY INTERACTIVE<br>ENTERTAINMENT LLC,<br><br>                    Defendant. | Case No.  21-cv-00778-EMC<br><br>**PUBLIC/REFILING**<br><br>**ORDER DENYING DEFENDANT'S<br>MOTION TO DISMISS**<br><br>Docket No. 27 |

## I.      INTRODUCTION

Plaintiff ESC-Toy Ltd. ("ESC") has filed suit against Sony Interactive Entertainment LLC ("Sony").  ESC makes claims for: (1) breach of oral contract, (2) unjust enrichment, (3) breach of the covenant of good faith and fair dealing, and (4) breach of written contracts.  *See* Complaint (Docket No. 1).  Currently pending before the Court is Sony's motion to dismiss the complaint (Docket No. 27).

## II.      FACTUAL & PROCEDURAL BACKGROUND

A.      Factual Background

In the Complaint, ESC alleges as follows.

ESC is a Nevada corporation having a principal place of business in Las Vegas, Nevada. *See* Compl. ¶ 1.  ESC is a brand management and development company that provides collectible merchandising works in the gaming and entertainment industries.  *Id.*  Sony is a California limited liability company with its principal place of business in San Mateo, California.  *Id.* ¶ 2.  Sony Interactive Entertainment LLC is a wholly owned subsidiary of Sony Corporation of America, and they are responsible for the PlayStation brand and services associated with the video game and

United States District Court
Northern District of California

1   digital entertainment industry.  *Id.*

2   ████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████

23          Subsequently, ESC conceptualized a pin program that would cultivate the unmet demand

24  for a pin collecting culture in the video game industry that ESC had identified.  *Id.* ¶ 61.  The

25  concept was to allow ESC to provide an all-inclusive set of services designing, manufacturing, and

26  promoting limited and exclusive collectible pins in conjunction with video game brands, events, or

27  products.  *See id* ¶ 59.  In pursuit of the concept, on October 2, 2017, ESC and Sony entered into

28  an oral agreement for the PlayStation Pin Program, called the "Exclusive Vendor Agreement"

("EVA"). *Id.* ¶ 74. Under the EVA, Sony granted ESC the exclusive right to provide pins to Sony under the PlayStation Pin Program as the Global Master Vendor. *Id.* In exchange, ESC agreed not to present a pin collection and trading program to Sony's competitors. *Id.* ESC would conceptualize, design, manufacture, and supply pins to be included in pre-sale promotional PlayStation items or events to occur within one year, including pre-orders for upcoming game releases and pins for various video games for the PlayStation 4 product. *Id.* ESC would also provide marketing and promotional services associated with the PlayStation Pin Program and each pre-sale promotion item or event. *See id.* ESC was to be Sony's exclusive supplier for the PlayStation Pin Program. *See id.*

While ESC was preparing for the PlayStation Pin Program Launch in December 2017, Sony told ESC that they were pushing back the launch until 2018. *See Id.* ¶ 75. ESC continued to invest hundreds of hours into the PlayStation Pin Program and would continue to share proprietary information with Sony. *See id.* ¶¶ 77, 79. ESC unsuccessfully attempted to contact Sony on two occasions in 2018 regarding the EVA, and Sony eventually informed ESC that they would not be using ESC for the PlayStation Pin Program. *Id.* ¶ 81.

ESC alleges that Sony took internal steps to steal the PlayStation Pin Program, violate the EVA, and establish the PlayStation Pin Program with other vendors. *See id.* ¶ 82-83. *See id.* ¶ 84. Sony took ideas from ESC, and the PlayStation Pin Program's release for *God of War* and *Spider-Man* were both extremely successful. *See id.* ¶ 85-87.

B.    Transfer Background

This case arises from Sony's Motion to Change Venue from the U.S. District Court in the District of Nevada based on the MLA's forum selection clause. Docket No. 115 at 9. That motion was granted by Judge Navarro. Docket No. 115.

Judge Navarro found that the case should be transferred to the Northern District of California under the MLA's forum-selection clause, regardless of whether the EVA is a modification of the MLA or an entirely separate agreement. *See* Docket No. 115 at 6. This holding impacts the Court's choice-of-law analysis, discussed further *infra*.

3

III.   **DISCUSSION**

A.   Choice-of-Law

California's choice-of-law rules apply to the instant case.  Normally, when a civil action based on diversity jurisdiction is transferred from one district court to another pursuant to § 1404(a), the transferee forum must apply the law of the transferor forum.  *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964).  However, the rule does not apply "when a transfer stems from the enforcement of a forum-selection clause: The court in the contractually selected venue should not apply the law of the transferor venue to which the parties waived their right."  *Atl. Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49, 65-66 (2013).

Here, Judge Navarro held that the MLA's forum selection clause applies to this dispute and ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ governs the substantive issues because that would assume the ultimate question of whether the EVA is a modification of the MLA or a separate agreement.  Thus, in the absence of a clearly applicable contractual provision, the Court must consult the general choice-of-law rules that apply to disputes of this nature.  Because both the EVA and MLA are contracts, the Court must first look to California Civil Code § 1646, California's choice of law rule applicable to contract disputes.

B.   Place of Performance and Acceptance

Civil Code Section § 1646 provides that: "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed; or if it does not indicate a place of performance, according to the law and usage of the place where it is made."  Cal. Civ. Code § 1646.  Applying Cal. Civ. Code § 1646, the Court looks first to "the place where [the EVA] [was] to be performed."

ESC is a Nevada corporation that has its principal place of business in Las Vegas, Nevada. Docket No. 1 ¶ 1.  Under the EVA, ESC would conceptualize, design, manufacture, and supply pins to be included in pre-sale promotional PlayStation items or events to occur within one year. *See id*. ¶ 74.  Given the focus of the EVA is the work to be performed by ESC (and not that performed by Sony), the place of performance under § 1646 is the site of ESC which is

4

United States District Court
Northern District of California

1  headquartered in Las Vegas.  Indeed, ESC states that it performed under the EVA by working on

2  product planning, product logistics, a product marketing plan, creating URLs unique to the EVA,

3  product design, product control art, product packaging, product brand naming and continuing

4  research and development, all from its Las Vegas office.  *See* Docket No. 131 at 3.  Accordingly,

5  the EVA is governed by Nevada law.

6          Even if the place of performance were not clear and the Court were to look to the law of

7  the place where the EVA was *made*, Cal. Civ. Code § 1646, the critical question is where the

8  plaintiff accepted the contract.  *Arno v. Club Med*, 22 F.3d 1464, 1468 n.6 (9th Cir. 1994).  *See*

9  Restatement Second of Contracts § 64, Comment c ("the contract is created at the place where the

10  acceptor speaks or otherwise completes his manifestation of assent.") (cited in *Arno*.  *Id.*).  Here,

11  ESC states that it accepted and agreed to Sony's offer from its Las Vegas office on October 2,

12  2017.  Docket No. 131 at 2 (citing Docket No. 73, Chatel Decl., ¶ 11).  In contrast, Sony states

13  that "the alleged *negotiations* can reasonably be presumed to have occurred in California."

14  Docket No. 130 at 3 (emphasis added).  But under *Arno*, the test is not where the negotiations took

15  place.  Instead, the Court looks to where the acceptor *manifests their assent*.  *Arno*, 22 F.3d at

16  1468 n.6.  ESC has alleged that, as the acceptor, they manifested their assent from Las Vegas.

17  Docket No. 131 at 2.

18          Thus, the Court finds that the EVA was made in Nevada.  Nevada substantive law applies.

19  C.      The EVA is a Separate Contract from the MLA

20          The Court next examines whether the EVA is a modification of the MLA or an entirely

21  separate contract under Nevada law.  The parties' dispute over whether the California Civil Code

22  or California Commercial Code applies to determine the contractual status of the EVA is moot.

23  Instead, the Court looks to Nevada substantive law on contracts.

24          Nevada applies the cardinal change doctrine, which provides a breach remedy for

25  contractors who are directed to perform work which is not within the general scope of the contract,

26  and which is therefore not redressable under the contract.  *J.A. Jones Constr. Co v. Lehrer*

27  *McGovern Bovis, Inc.*, 120 Nev. 277, 89 P.3d 1009, 1021.  Under the cardinal change doctrine, the

28  Nevada Supreme Court in *J.A. Jones Constr. Co.* announced the standard by which work is so

significantly altered that it is deemed a new contract and not a contract modification: "when the work is so drastically altered that the contractor effectively performs duties that are *materially different* from those for which the contractor originally bargained." *J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*, 120 Nev. 277, 293 n.34, 89 P.3d 1009, 1020 (2004) (emphasis added; quoting *PCL Constr. Servs., Inc. v. United States,* 47 Fed. Cl. 745 (2000)). Courts must also examine whether a modification "materially changes the field of competition." *See id.* Notably, a cardinal change can occur even when there is no change in the final product; the court looks to the "entire undertaking of the contractor" (*i.e.*, the work that is being asked of the contractor.) *See Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1332 (Fed. Cir. 2003) (quoting *Edwin R. Marden Corp. v. United States*, 442 F.2d 364, 370, 194 Ct. Cl. 799 (Ct. Cl. 1971)).

Here, in applying the general standard set out by *J.A. Jones*, ESC's performance under the EVA was "materially different" from its performance under the MLA. *J.A. Jones*, 120 Nev. at ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ Sony's *exclusive supplier* for certain merchandise. *See* Docket No. 1 ¶ 74. The EVA required ESC to take on far more responsibilities relative to Sony than the MLA; ESC had to conceptualize, design, manufacture, and supply pins to be included in the pre-sale promotional PlayStation items or events, including pre-orders for upcoming game releases. *See id.* ESC was tasked with laying out a comprehensive plan for Sony concerning the details of the pin program's implementation. *See id.* The comprehensive plan would include methods by which the pins could be used to boost sales of Sony products, promote new and existing products, and provide customer incentives. *Id.* ESC also would discuss concepts and direction for marketing campaigns that had ***never*** been implemented with ESC's previous pins for Sony. *Id.* Thus, ESC's duties and work under the EVA were materially different from those for which they originally bargained for under the MLA, and this indicates that the EVA is a new contract. *J.A. Jones Constr. Co*., 120 Nev. at 293 n.34.

1    Further, as to whether the contract "materially changes the field of competition," *J.A.*

2    *Jones Constr. Co.*, 120 Nev. at 1020 n.34, here, the field of competition under the EVA has been

3    materially changed compared to the MLA because ESC was tasked with creating a new customer

4    █████████████████████████████████████████████████████████████████████████████

5    █████████████████████████████████████████████████████████████████████████████

6    No. 1 ¶ 40.  The EVA, by contrast, was not just engaging an existing gaming community's

7    interest, but driving more sales through new pre-order incentives by growing the brand's (Sony's)

8    culture through global engagement.  *See* Docket No. 1 ¶ 66.  Thus, ESC's work under the EVA

9    materially expanded the field of competition.  Under the EVA, ESC would utilize marketing and

10   promotional services to engage *new,* global customer bases targeted by *Sony*, while its work under

11   the MLA was focused on engaging both *ESC and Sony's* individual, pre-existing customer bases

12   for certain games by selling merchandise.  *See* Docket No. 1 ¶¶ 43, 74.  The differences in the

13   field of competition under the MLA and the EVA indicate that a new contract had been formed.

14   *J.A. Jones Constr. Co.*, 120 Nev. at 1020 n.34.

15   Lastly, the Court examines the "entire undertaking of the contractor."  *See Rumsfeld*, 329

16   █████████████████████████████████████████████████████████████████████████████

17   key provisions of the EVA is to allow ESC the ability to bundle collectible pins with pre-orders

18   for Sony's video games (and other events) as a promotional tool to increase Sony's video game

19   █████████████████████████████████████████████████████████████████████████

20   █████████████████████████████████████████████████████████████████████████████

21   █████████████████████████████████████████████████████████████████████████████

22   █████████████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████

24   █████████████████████████████████████████████████████████████████████████

25   odds with its undertaking under the EVA.  *See* Docket No. 1 ¶ 62.

26   Even if the Court were to apply California substantive law, the result would be the same.

27   The California Court of Appeal provided the following definition for contract modifications: "[a]n

28   'alteration' is a modification or change in one or more respects which introduces new elements

1   into the details of the contract, or cancels some of them, but *leaves the general purpose and effect*

2   *undisturbed*." *Eluschuk v. Chem. Eng'rs Termite Control, Inc*., 246 Cal. App. 2d 463, 469 (1966)

3   (emphasis added; citing *Grant v. Aerodraulics Co.*, 91 Cal. App. 2d 68, 74 (1949)).  *See also Han*

4   *v. Mobil Oil Corp.*, 73 F.3d 872, 876-77 (9th Cir. 1995) ("the parties to a contract have the power

5   to add, change, or cancel provisions so long as the purpose and effect of the original contract are

6   left undisturbed."); *Herring Networks, Inc. v. AT&T Servs.*, No. 2:16-cv-01636-CAS-AGR, 2016

7   U.S. Dist. LEXIS 98231 (C.D. Cal. July 25, 2016) (concluding that the U-Verse Agreement was a

8   distinct contract from the DirecTV contract, rather than a mere modification, because the DirecTV

9   contract had "materially distinct terms" from the U-Verse Agreement.).

10         For the reasons discussed above, the general purpose and effect of the EVA is completely

11   ████████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████████

13   contract, not a mere modification of the MLA.  *See Eluschuk*, 246 Cal. App. 2d at 469; Hottinger

14   Decl., Ex. A. ¶ 6.3; Docket No. 1 ¶ 62.

15         Accordingly, whether under California or Nevada law, the EVA is a separate contract from

16   the MLA rather than a modification of the MLA.

17   D.   <u>Statute of Frauds</u>

18         Sony contends that the EVA is barred by the "one year" provision of the statute of frauds.

19   Docket No. 27 at 9.  ESC states that the "one year" provision does not bar the EVA because the

20   agreement could have been completed within a year, and therefore no writing is necessary.

21   Docket No. 51 at 7.

22         Nevada's Statute of Frauds provides that "[e]very agreement that, by the terms, is not to be

23   performed within 1 year from the making thereof" is void unless it is in writing.  *See* Nev. Rev.

24   Stat. Ann.§ 111.220(1).  Nevada interprets the "one year" provision of the statute of frauds

25   literally and narrowly.  *See Grilz v. Sanchez,* No. 60447, 2013 Nev. Unpub. LEXIS 1466 (Sep. 26,

26   2013) ("substantial law supports that if the contract can be performed within one year and is not

27   otherwise subject to the statute of frauds, it need not be in writing"); *Atwell v. Sw. Sec.*, 107 Nev.

28   820, 824-25, 820 P.2d 766, 769 (1991) (concluding that an oral contract of potentially infinite

United States District Court
Northern District of California

United States District Court
Northern District of California

1    duration was not precluded by the statute of frauds where nothing indicated it could not possibly

2    be completed within one year).  *See also Mohney v. Eliades*, 2017 Nev. App. Unpub. LEXIS 742,

3    133 Nev. 1004, 2017 WL 4711956 (concluding that it was possible at the time the oral agreement

4    was entered into that the parties would decide not to move forward with the business within one

5    year); *Stone v. Mission Bay Mortg. Co.*, 99 Nev. 802, 672 P.2d 629 (1983) (concluding that the

6    alleged employment contract did not fall within the statute of frauds because it could have been

7    terminated within one year).

8            Accepting ESC's factual allegations as true, the parties contemplated that the EVA was to

9    be performed within one year:  on October 2, 2017, "ESC would conceptualize, design,

10   manufacture, and supply pins to be included in pre-sale promotional PlayStation items or events to

11   occur within one year…"  *See* Docket No. 1 ¶ 74.  Nothing indicated that the EVA could not

12   possibly be completed within one year.  Further, although Sony delayed the launch date for the

13   PlayStation Pin Program to 2018, ESC found out that Sony would not be honoring its end of the

14   bargain and was in breach by April 23, 2018, before a year had passed.  *See* Docket No. 1 ¶¶ 75,

15   81.

16           Accordingly, the statute of frauds does not bar enforcement of the EVA.[1]

17   E.      The Copyright Act does not bar the EVA

18           Sony claims that, even if the statute of frauds does not bar the EVA, Section 204(a) of the

19   Copyright Act requires exclusive licenses to be in writing.  *See* Docket No. 27 at 10 n.4.  ESC

20   counters that the EVA is a nonexclusive, implied license, and therefore it does not need to be in

21   writing.  *See* Docket No. 41 at 14.

22           "A transfer of copyright ownership, other than by operation of law, is not valid unless an

23   instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by

24

25   ───────────────────────
     [1] The statute of frauds also would not bar enforcement of the EVA under California law.  *See*
26   *Robards v. Gaylord Bros., Inc.*, 854 F.2d 1152 (9th Cir. 1988) (concluding that the statute of frauds
     only applies if there is not the slightest possibility that it can be fully performed within one year);
27   *Newfield v. Ins. Co. of W.*, 156 Cal. App. 3d 440, 447 203 Cal. Rptr. 9 (1984) (holding that if an
     oral agreement is capable of being performed within a year, it is not within the confines of the
28   statute of frauds).  As discussed *supra*, the EVA was capable of being performed within a year,
     and the parties contemplated that EVA was to perform its end of the bargain within one year.

9

United States District Court
Northern District of California

the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C § 204(a). The Act defines "transfer of copyright ownership" as "an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, *but not including a nonexclusive license*." 17 U.S.C. § 101 (emphasis added). Thus, a nonexclusive license is excluded from the writing requirement of 17 U.S.C. § 204 and can be granted (1) orally, or (2) by implication. *See Effects Assocs. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990). *See also Foad Consulting Grp., Inc. v. Musil Govan Azzalino*, 270 F.3d 821, 826 (9th Cir. 2001) ("[a] nonexclusive copyright license may be granted orally or by implication"). The Ninth Circuit has held that "[t]he existence of a nonexclusive license may be *implied* from the manner in which the parties conducted their relationship if a licensee 'created work at [the licensor's] request and handed it over, intending that the [licensor] copy and distribute it.'" *Effects Assoc.*, 908 F.2d at 558-59 (emphasis added; citing *Offley v. Activision, Inc.*, 273 F. App'x 610 (9th Cir. 2008)).

Here, the EVA is in essence a supplier agreement, not a copyright transfer agreement. Under the EVA, ESC would conceptualize, design, manufacture, and *supply* pins for Sony to be included in the pre-orders for upcoming game releases. *See* Docket No. 1 ¶ 74.

To the extent the EVA implicitly granted a license to ESC to use some of Sony's copyrights, it was not an exclusive license. *See* Docket No. 41 at 15. Rather, the exclusivity term granted ESC the right to be Sony's exclusive *provider* of the PlayStation Pin Program, and ESC agreed it would not present a similar program to Sony's potential competitors. Docket No. 1 at 74. ESC does not allege that it was the exclusive *licensee* of copyrighted material under the EVA, but was instead the exclusive *supplier* of pins for Sony. Docket No. 1 ¶ 124. As the EVA did not convey an exclusive copyright license to ESC, the Copyright Act does not require a writing. As stated *supra*, a nonexclusive copyright license may be granted orally or by implication. *See Effects Assocs.*, 908 F.2d at 558.

In sum, the EVA is in essence a supplier agreement, not a copyright transfer agreement. At most, it contemplated a nonexclusive copyright license. Accordingly, the Court finds that the EVA is not barred by Section 204(a) of the Copyright Act.

IV.     **CONCLUSION**

For the foregoing reasons, the Court finds that the EVA is a separate agreement that is not barred by the statute of frauds and not barred by Section 204(a) of the Copyright Act. Accordingly, Defendant's Motion to Dismiss is **DENIED** as to Plaintiff's First Claim for Relief (Breach of Oral Contract) and Fourth Claim for Relief (Breach of Written Contract).  The Court reserves judgment on the Second Claim for Relief (Unjust Enrichment) and Third Claim for Relief (Breach of Implied Covenant of Good Faith and Fair Dealing) because it has directed the parties to submit supplemental briefing on these two claims under Nevada law.  Docket No. 151.

Out of an abundance of caution, the Court is sealing the entirety of this order.  The parties are ordered to meet and confer to determine what, if any, portions of this order are required to be sealed.  Within a week of the date of this order, the parties shall file a stipulation containing a narrowly tailored sealing request.

This order disposes of Docket No. 27.


**IT IS SO ORDERED**.


Dated: July 21, 2021


_____
EDWARD M. CHEN
United States District Judge