KXT LAW, LLP
Karineh Khachatourian (SBN 202634)
karinehk@kxtlaw.com
Rachael C. Chan (SBN 265002)
rachael@kxtlaw.com
Oren J. Torten (SBN 332720)
oren@kxtlaw.com
1775 Woodside Road, Suite 204
Redwood City, California 94061
Telephone: 650-239-0420
Facsimile: 650-249-5013

Attorneys for Defendant,
Sony Interactive Entertainment LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ESC-TOY LTD., a Nevada corporation,<br><br>Plaintiff,<br><br>v.<br><br>SONY INTERACTIVE ENTERTAINMENT, LLC, a California limited liability company,<br><br>Defendant. | Case No. 3:21-cv-00778-EMC-DMR<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISQUALIFY MASCHOFF BRENNAN, MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:  October 19, 2023<br>Time:  1:30 p.m.<br>Crtrm.:  Courtroom 5 – 17th Floor<br>Judge:  Hon. Edward M. Chen<br><br>**[UNREDACTED VERSION - FILED UNDER SEAL]** |

## NOTICE OF MOTION AND MOTION

### TO THE CLERK AND ALL PARTIES AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on October 19, 2023, at 1:30 p.m., in Courtroom 5 of this Court, located at 450 Golden Gate Ave., 17th Fl., San Francisco, California, Defendant Sony Interactive Entertainment LLC ("SIE") will and hereby does move, pursuant to the California Rules of Professional Conduct 1.6, 1.9 (previously Rule 3-310(E)), and 3-3(a), California Business and Professions Code section 6068(e)(1), Civil Local Rule 11-4, and the Court's inherent authority, for an order disqualifying Maschoff Brennan ("MABR"), counsel to Plaintiff ESC-Toy Ltd. ("ESC"), from this action because (1) MABR improperly obtained SIE confidential and attorney client privileged and work product information; (2) MABR has a conflict of interest and (3) MABR's breached its duty of candor to this Court and SIE.

### ISSUES TO BE DECIDED

1.     Whether MABR should be disqualified from representing ESC in this action because MABR, at ESC's behest, obtained SIE's confidential and/or attorney-client privileged and work product information from its former employee of sixteen years, Shelly Gayner, and used that information adverse to SIE in this lawsuit.

2.     Whether Gayner, SIE's former in-house counsel who received confidential and attorney client/work product information regarding SIE in the regular course of her employment at SIE, has an irreconcilable conflict of interest because this case's subject matter is substantially related to Gayner's prior work as SIE's Director of Legal and Business Affairs, and Director of Licensing.

3.     Whether Gayner's conflict of interest is imputed to MABR, which has worked closely with and received confidential and/or attorney-client privileged work product information regarding SIE from Gayner directly or through ESC, also requiring that MABR be disqualified from this action.

4.     Whether MABR should be disqualified from representing ESC in this action to maintain the integrity of the judicial process due to MABR's and ESC's actions, including a lack of candor to this Court and to SIE.

1

2

3   Dated: September 7, 2023                          Respectfully submitted,

4                                                     KXT LAW, LLP

5

6

7                                        By:   */s/ Karineh Khachatourian*
                                               _____
8                                              Karineh Khachatourian
                                               Rachael C. Chan
9                                              Oren J. Torten

10                                             Attorneys for Defendant,
                                               Sony Interactive Entertainment LLC
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS .................................................................................. 1

    A.    ESC's Allegations Stem from its Relationship with SIE and the 2014 MLA .......... 1

    B.    Gayner Worked at SIE from 1998 to 2014 ................................................ 2

    C.    Gayner Assisted ESC in Pitching its Pin Idea to SIE, Advised ESC Regarding the Purported EVA, the 2014 MLA, and Related Legal Claims .................................... 4

    D.    Gayner Works with MABR on this Matter ................................................ 5

    E.    MABR Attempts to Cover Up Gayner Role and Activities ................................ 6

    F.    ESC's Contradictory and False Discovery Responses Regarding Gayner ............. 7

    G.    MABR's Interference with Gayner's Production and Deposition .......................... 8

    H.    ESC Finally Takes a Position on Gayner's Role ......................................... 9

    I.    MABR Continues its Gamesmanship After Court Orders .............................. 10

    J.    Gayner Remembers Very Little at Her Second Day of Deposition ..................... 10

III.   LEGAL STANDARD ........................................................................................ 12

    A.    Breach of Duty of Confidentiality .......................................................... 12

    B.    Breach of Duty of Candor .................................................................... 13

    C.    Successive Representation .................................................................... 14

IV.   ARGUMENT .................................................................................................. 15

    A.    MABR Should Be Disqualified Because It Knowingly Induced Gayner to Disclose SIE Confidential Information .................................................................. 15

        1.    Gayner Has a Duty of Confidentiality to SIE, and Received SIE Confidential Information During Her Employment .................................. 15

        2.    Gayner Disclosed SIE's Confidential Information to MABR. .................. 17

        3.    MABR Improperly Received SIE's Confidential Information ................. 18

    B.    MABR Should be Disqualified Because Gayner Successively Represented Adverse Parties, and this is Imputed to MABR .......................................... 19

        1.    Gayner Represented SIE, and ESC, in Substantially Related Matters ........ 19

    (a)    Gayner's Representation of, and Work for, SIE Adverse to ESC ................... 19

    (b)    Gayner's Representation of ESC Materially Adverse to SIE ....................... 20

    (c)    Gayner's Representation of ESC Materially Adverse to SIE was on Substantially Related Matters, so MABR's Access to SIE Confidential Information is Presumed ........ 21

        2.    Gayner's Conflict is Imputed to MABR ......................................... 21

    C.    The Appearance of Impropriety Also Necessitates Disqualification .................... 23

    D.    ESC Will Not Be Prejudiced by MABR's Disqualification ............................ 24

V.    CONCLUSION ................................................................................................ 24

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Advanced Messaging Techs., Inc. v. Easylink Servs. Int'l Corp.*,
5
   913 F. Supp. 2d 900 (C.D. Cal. 2012)..................................................................... 15, 22, 23

6

*Cargill Inc. v. Budine*,
   No. CV-F-349-LJO-SMS, 2007 WL 1813762 (E.D. Cal. June 22, 2007)
7
   ................................................................................................................. 13, 14, 16, 18

8

*City & Cnty. of San Francisco v. Cobra Sols., Inc.*,
9
   38 Cal. 4th 839 (2006)............................................................................................... 14

10

*Davis v. State Bar*,
   33 Cal.3d 231 (1983)................................................................................................. 13

11

*Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*,
12
   20 Cal. 4th 1135 (1999)......................................................................................... 14, 24

13

*Di Sabatino v. State Bar*,
   27 Cal. 3d 159 (1980)............................................................................................... 13
14

15

*Farris v. Fireman's Fund Ins. Co.*,
   119 Cal. App. 4th 671 (2004).................................................................................... 19

16

*Global Van Lines, Inc. v. Superior Court*,
17
   144 Cal. App. 3d 483 (1983)..................................................................................... 19

18

*Henriksen v. Great Am. Savings & Loan*,
   11 Cal. App. 4th 109 (1992).................................................................................. 15, 22
19

20

*Huston v. Imperial Credit Commercial Mortgage Investment, Corp.*
   179 F. Supp. 2d 1157 (C.D. Cal. 2001).................................................................... 13

21

*Jessen v. Hartford Cas. Ins. Co.*,
22
   111 Cal. App.. 4th 698, 705-06 (2003) ............................................................. 14, 21, 22

23

*Pacific Harbor Capital, Inc. v. Carnival Air Lines, Inc.*,
   210 F.3d 1112 (9th Cir. 2000)................................................................................... 13
24

25

*Packard Bell NEC v. Aztech Sys. LTD*,
   No. CV 98-7395 DT (EX), 2001 WL 880957 (C.D. Cal. Jan. 22, 2001)
26
   ................................................................................................................. 13, 14, 16, 18

27

*Reid v. Costco Wholesale Corp.*,
   No. 8:23-cv-00255-FWS-JDE, 2023 WL 3432168 (C.D. Cal. Apr. 20, 2023) ............... 15, 20

28

ii

*Trone v. Smith*,
    621 F.2d 994 (9th Cir. 1980) ........................................................................................ 14, 24

*U.S. v. Chen*,
    99 F.3d 1495 (9th Cir. 1996) ............................................................................................... 13

*ViChip Corp. v. Lee*,
    No. C 04-2914 PJH, 2004 WL 2780170 (N.D. Cal. Dec. 3, 2004) .................................. 12, 14

*Wellons v. PNS Stores, Inc.*,
    No. 18-CV-2913-DMS-WVG, 2020 WL 12834156 (S.D. Cal. Jan. 31, 2020) ..................... 13

*Zurich Am. Ins. Co. of Ill. v. VForce Inc.*,
    No. 2:18-CV-02066-TLN-CKD, 2021 WL 1193963 (E.D. Cal. Mar. 30, 2021) .................. 20

**Statutes**

California Business and Professions Code section 6068(d) ........................................................ 13

California Business and Professions Code section 6068(e)(1) ........................................... 1, 12, 15

**Other Authorities**

California Rules of Professional Conduct 1.6 ........................................................................ 1,12

Local Rule 11-4 ...................................................................................................................... 1, 12

RPC Rule 1.9(a) .......................................................................................................................... 12

RPC 3-3(a) ................................................................................................................................... 13

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

SIE brings this motion to disqualify ESC's counsel of record, MABR: (1) because it improperly received SIE's confidential and/or attorney-client/work product information ("Confidential Information") from SIE's former employee and in house attorney Shelly Gayner; (2) because Gayner provided legal advice to ESC on matters substantially related to the subject matter of this litigation, and therefore her conflict should be imputed to MABR; (3) to maintain fundamental fairness and the integrity of the judicial system; and (4) because MABR and ESC have not been transparent about their dealings with Gayner.

Over the last year SIE has learned that Gayner assisted ESC adverse to SIE starting in 2017 by providing legal advice on its pin program pitch, alleged "Exclusive Vendor Agreement" (the "EVA"), legal claims against SIE, and interpretation of the Merchandise License Agreement signed by Gayner between SIE and ESC (the "2014 MLA") – all of which were directly related to her role and responsibilities at SIE. Gayner further submitted a declaration adverse to SIE in this case, drafted by MABR that on its face contains SIE Confidential Information. And MABR and ESC did not make obtaining this information easy.  MABR and ESC have not been forthcoming and engaged in classic sword and shield gamesmanship – initially denying that Gayner was ESC's attorney and trying to hide her role and resulting conflict of interest regarding her declaration, but then reversing course and asserting her role as ESC's attorney in order to shield Gayner's documents from production. As demonstrated below, the facts show that MABR should be disqualified from representing ESC in this matter due to an irreconcilable conflict of interest and to preserve the fundamental fairness and integrity of the judicial process.

### II.    STATEMENT OF FACTS

#### A.     ESC's Allegations Stem from its Relationship with SIE and the 2014 MLA

As recognized by the Honorable Judge Ryu, the 2014 MLA is unquestionably relevant to the claims and defenses in this action. Dkt No. 277, at 1:24-26. This case involves the same parties to the 2014 MLA and this dispute stems from the same subject matter. Moreover, ESC relies on the 2014 MLA and discusses it at length in its Complaint when describing the Parties' purported

1

1  course of conduct over eleven years. Dkt. No. 1, ¶¶ 33, 38;¶¶ 42-46. The 2014 MLA granted ESC

2  ██████████████████████████████████████████████████████████████

3  ██████████████████████████████████████████████████████████████

4  ████████████ *Id*. ¶¶ 42-43. Then in 2017, ESC pitched the idea of designing and making

5  tradeable collectible pins for SIE. *Id*. ¶ 68; Ex. 1[1], p. 32. However, SIE decided not to pursue

6  ESC's proposed plan. *See id.*, p. 32. Had SIE been interested, the parties recognized that the

7  agreement would be in the form of an amendment to the 2014 MLA, as the parties had done

8  before. Ex. 2. Nonetheless, ESC then brought this action against SIE, alleging that a single SIE

9  employee formed, and breached, a multi-year worldwide exclusive *oral* contract with ESC relating

10  to the subject matter of ESC's failed pitch, which ESC labels the "Exclusive Vendor Agreement,"

11  or "EVA." Dkt No. 1, ¶¶ 71-75, 81. As such, one of SIE's central defenses is that the 2014 MLA's

12  integration clause prohibits oral agreements and any additional work would have been formalized

13  in an amendment to the 2014 MLA. Ex. 3, § 16.4; *see also* Dkt. No. 277, at 1:24-26; Dkt. No. 115,

14  at 6:3-5 and 6:9-10; Ex. 4; Ex. 2.

**B.      Gayner Worked at SIE from 1998 to 2014**

16         Gayner is a licensed California attorney who worked for SIE for approximately sixteen

17  years. Dkt. No. 74, ¶ 1; Ex. 5. During her first nine years at SIE, Gayner served as in-house

18  counsel, as Director of Legal and Business Affairs. Dkt. No. 74, ¶ 1; Ex. 6, at 69:1-4; Ex. 5. In

19  Gayner's own words, during her employment at SIE, she "was involved in the negotiations of

20  hundreds of Peripheral Licenses and Merchandise License Agreements." Dkt. No. 74, ¶¶ 1-2; *see*

21  *also* Ex. 5 ("As lead counsel I negotiated, reviewed and drafted all transactional agreements

22  including … merchandise …"). ███████████████████████████████████████

23  ███████████████████████ Ex. 6, at 128:22-129:1. She was "Primary Attorney for all

24  departments for PlayStation division of SONY throughout the Americas," and "[m]anaged a team

25  of 2 attorneys and 3 paralegals." Dkt. No. 74, ¶ 1; Ex. 5.

---

27  [1] All references to Exhibits in this brief refer to the exhibits to the concurrently filed declaration of

28  Karineh Khachatourian in support of this Motion to Disqualify.

In 2007, Gayner transitioned into a new position at SIE with the title Director of Licensing, as detailed by a press release issued by SIE touting Gayner's "perfect blend of legal expertise and videogame industry knowledge" and highlighting her prior experience with merchandise license agreements working in SIE's legal department. Ex. 6, at 81:24-83:11; Ex. 32. During her time as Director of Licensing, Gayner established SIE's licensing department and continued negotiating merchandise license agreements. Ex. 6, at 70:6-13, 72:6-9; Ex. 5. In this role, Gayner interacted with SIE's legal department, "[p]robably almost every day." Ex. 6, at 73:7-10, 96:6-12. And she continued to work with the team she managed in the legal department. *Id.*, at 73:18-74:10, 96:13-24. She testified that her department would give the business terms for a negotiation of a merchandise license agreement to the legal department, which would then draft an agreement to be sent back to the third-party vendor, and negotiations would ensue from there. *Id.* at 75:6-76:11. Gayner would be directly involved with negotiations where the issues involved business terms, and she would often sign the agreements, binding SIE to their terms. *Id.* at 72:23-73:1, 76:4-11. Gayner was still an attorney when she was the Director of Licensing. She was still an active California Bar member; *Id.*, at 71:20-22; and she continued taking CLE courses and testified she believed SIE paid her bar dues during this time. *Id.*, at 71:23-72:5.

In 2014, Gayner, on behalf of SIE, negotiated and drafted the 2014 MLA, opposite ESC. Dkt. No. 74, ¶ 7. Gayner signed the 2014 MLA, binding SIE to its terms. Dkt. No. 74, ¶ 7; Ex. 6, at 72:23-73:1, 251:1-4; Dkt. No. 104, 3:17-18. Gayner has admitted that █████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ Dkt. No. 74, ¶ 3; Ex. 6, at 129:2-9. Over her 16 years, Gayner was involved in many aspects of SIE's merchandise and licensing deals. Ex. 5, p. 1.; Dkt. No. 74, ¶¶ 1-3, 7. Gayner has testified that ███████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████ *See generally* Dkt. No. 100; *see also, e.g.*, ¶¶ 3-4, 12-14.

On January 5, 1998, Gayner signed a non-disclosure agreement ("NDA") relating to her

3

1  employment at SIE. Even after her 2014 departure, ████████████████████████

2  ███████████████████████████████████████████. Ex. 27, p. 8. Neither Gayner, ESC,

3  nor MABR have ever disputed its enforceability.

      **C.**      **<u>Gayner Assisted ESC in Pitching its Pin Idea to SIE, Advised ESC Regarding the Purported EVA, the 2014 MLA, and Related Legal Claims</u>**

      Unbeknownst to SIE, Gayner had been advising ESC adverse to SIE since 2017. Dkt. No.

6  250, ¶¶ 6, 8. Gayner assisted and advised ESC ████████████████████████████

7  ████████████████████████████████████████████████████████████

8  █████████████ *See, e.g.*, Ex. 7; Ex. 4; Ex. 1, p. 39; Ex. 8, p. 1 ("negotiation strategy and advice

9  relating to Sony pin program"), p. 2 ("advice relating to draft Sony pin program term sheet";

10  "advice regarding draft Sony pin program term sheet"; "Draft of Sony pin program term sheet"),

11  and p. 3 ("Discussion of revisions to draft Sony pin program term sheet"); Ex. 9 ("Review Term

12  Sheet," "Draft Term Sheet," "Redraft Term Sheet," and "Review New Term Sheet"); Ex. 10.

13  ████████████████████████████████████████████████████████████

14  █████████████████████████████████████████████. Ex. 4.

      Gayner also advised ESC regarding ESC's various potential claims against SIE, her former

16  employer, from at least 2017 to 2019. *See, e.g.*, Ex. 8, p. 4 ("advice relating to Sony pin program

17  and potential legal issues and claims against Sony"), p. 5 ("advice relating to Sony pin program

18  and potential legal issues, additional claims against Sony, and investigation regarding claims

19  against Sony"; "advice regarding investigation of and strategy regarding claims against Sony, and

20  discussion of fact-finding for claim against Sony"), p. 6 ("Discussion of analysis of, fact-finding

21  for, and strategy regarding claims against Sony"). Gayner also introduced ESC to ████████

22  ████████████████████████████████████████████████████████████

23  ██████ Ex. 11, at 389:11-22; Ex. 12 ████████████████████████; Ex. 8, at p. 21

24  ("[d]iscussion regarding introduction to damages consultant for claims against Sony").

      Finally, as she admitted in deposition, Gayner also provided legal advice to ESC regarding

26  "interpretations of the [2014 MLA] agreement and the amendment" during the 2016-2018 time

27  frame. Ex. 5, at 56:6-21. Gayner did this even though she acknowledged in deposition that SIE's

1  interpretation of certain merchandise license agreement terms is Confidential Information. *Id*. at

2  93:17-20, 95:4-96:5. Gayner also wrote a letter on behalf of ESC to SIE's in-house counsel Dan

3  Herp on July 17, 2019 (the "July 2019 Letter"), the preparation of which involved several

4  discussions with ESC and its counsel Innes Smolansky. Ex. 13; Dkt. No. 277, at 3:21-22; Ex. 14

5  ("Review ---- and draft letter to Dan Herp"; Ex. 15 ("[f]inalize letter to DH, review documents to

6  begin drafting letter to DH re: outstanding payments, email to ES," "[r]eview documents in

7  preparation of drafting letter to DH"); Ex. 16 ("[c]ontinue[ing] drafting revised letter to DH"); Ex.

8  17; Ex. 18; Ex. 19. The July 2019 Letter included ███████████████████████████

9  ███████████████████████ July 2019 Letter, p. 2. ██████████████████████

10  ██████. Ex. 13, p. 4. ████████████████████████████████████

11  ███████████████████████████████████████ Ex. 6, at 99:13-17;

12  Dkt. No. 277, at 4:6-10; Ex. 20.

13     In an email dated April 13, 2019, Gayner apparently knew that ████████████████

14  ████████ Ex. 17 ██████████████████████████████████████████

15  ██████████████████████████████████████████████████████████

16  Ex. 1, p. 39; Ex. 4.

17     **D.   Gayner Works with MABR on this Matter**

18     On September 1, 2020, Gayner submitted a non-party declaration in opposition to SIE's

19  motion to transfer ("MTT") to rebut SIE's argument that ESC's EVA claims involved similar

20  subject matter to the 2014 MLA and thus should be subject to the 2014 MLA's forum-selection

21  clause. Dkt. Nos. 61, 71, 74; Ex. 21. This declaration was ███████████████████████

22  ████████████████████████████████████████████████████

23  ████████████████████████ 116:16-23, 117:18-21. Documents produced

24  reflect that Gayner had been working closely with MABR regarding this declaration and to oppose

25  SIE's MTT – including attending at least three calls prior to filing the declaration. There was also

26  at least one call after SIE filed its motion to strike ("MTS") Gayner's declaration involving

27  Gayner's NDA. It appears that Gayner participated in at least ████████████████████

28  ██████████████████████ leading up to the filing of the declaration in part because ██████

1 ███████████████████████████████████████████████████

2 ██████ Ex. 21; Ex. 22; Ex. 23; Ex. 24; Ex. 8 ████████████████████

3 ████████████████████████████████████████████████████████

4 ██████████████████████████████████████████████████

5 █████████████████████████

6       In the declaration, Gayner reiterated that she ████████████████████

7 █████████████████████████████████████████████████████████

8 ██████████████████████████████████ (*id*.), and she "executed the

9 2014 ESC MLA on behalf of Sony" (*id*.). Gayner then testified extensively about her ████

10 ████████████████████████ *Id*., ¶¶ 3-7. She also made substantial representations

11 about how the 2014 MLA would be interpreted. *Id*., ¶¶ 4-6, 11-14. And she testified in depth about

12 her understanding of the EVA (which she called the "PlayStation Pin Program"). *Id*., ¶¶ 8-15.

13 Gayner further provided her legal conclusion that the 2014 MLA and the EVA were separate and

14 distinct agreements. *Id*., ¶ 9. Gayner stated that this legal conclusion was "[b]ased on [her]

15 experience as Sony's Director of Licensing, [her] creation of the merchandise licensing program,

16 [her] negotiation of the 2014 ESC MLA, and [her] execution of the 2014 ESC MLA on behalf of

17 Sony … ." *Id*. ESC heavily cited and relied upon Gayner's conclusion and other testimony in

18 opposing SIE's MTT. *See, e.g.*, Dkt. No. 71, at 1:4-17, 5:3-10, 8:7-15. ESC also appears to have

19 relied on the same revelations disclosed in Gayner's declaration testimony in its opposition to

20 SIE's motion to dismiss. *See, e.g.*, Dkt. No. 40, at 4:21-23, 6:3-22, 7:7-15, 7:17-18.

21       **E.**       **MABR Attempts to Cover Up Gayner Role and Activities**

22       SIE immediately moved to strike Gayner's declaration on September 15, 2020, on the

23 grounds that ESC had improperly obtained SIE's Confidential Information from Gayner. Dkt. No.

24 86. SIE challenged ESC's conduct in "obtain[ing] information from private consultation with a

25 former employee and legal counsel outside the normal discovery procedures" and without any

26 "apparent safeguards." *Id*. at 4:17-19. SIE further argued that Gayner's declaration was "replete

27 with information that SIE considers confidential and that should not have been disclosed and used

28 in this litigation outside the formal discovery process, if at all." *Id*., at 4:7-9. SIE also raised

6

further concerns with MABR, and asked MABR to disclose all communications and documents exchanged with Gayner and to agree to cease communicating with her regarding the case. Dkt. No. 109-1. Rather than immediately ceasing the improper disclosure of SIE's Confidential Information, MABR ***refused to provide any information or agree to stop communications with Gayner*** and claimed that it was representing Gayner (though MABR shortly after changed its story when pressed and said they did not represent Gayner). *Id.* The Nevada court then transferred the matter to this Court, and SIE's MTS was mooted upon transfer. Dkt. No. 115.

When confronted, rather than come clean, MABR doubled down. In opposing SIE's MTS on September 29, 2020, ESC contended – in direct contradiction of substantial evidence and its prior representation (Dkt. No. 109-1) – that MABR did not represent Gayner and that Gayner ***did not represent ESC***. Dkt No. 104, at 7:15-17 ("[MABR] never undertook representation [of Gayner] and it does not intend to represent her."); *id*. at 10:4-5 ("Gayner is not attempting to represent ESC in this action and is thus not accepting representation adverse to SIE."). ESC even went so far as to contend that "Gayner has *no* knowledge of this action . . . ." *Id.* at 9:16-17 (emphasis added). Indeed, MABR reiterated this in a contemporaneous email: "[Gayner] lacks *any knowledge* of the substance of this case." Dkt No. 245-5. These statements were made even though ESC disclosed Gayner as a person with knowledge in its initial disclosures. Dkt No. 245-17, p. 2 ("Shelly Gayner is believed to have discoverable information about: ESC's development and creation of the PlayStation Pin Program; SIE accepting and asking ESC to proceed with the PlayStation Pin Program and Exclusive Vendor Agreement; breach of the Exclusive Vendor Agreement with ESC; and damages to ESC"). It is beyond dispute that ESC's statements about Gayner's knowledge were false.

### F.    ESC's Contradictory and False Discovery Responses Regarding Gayner

MABR has engaged in a three-year campaign to obfuscate the true nature and extent of Gayner's involvement with ESC adverse to SIE. On February 18, 2022, SIE propounded discovery to ESC and on March 18, 2022, served a subpoena on Gayner. ESC's April 12, 2022 and May 13, 2022 responses to this discovery revealed, in an apparent contradiction and for the *first time*, that Gayner acted as ESC's counsel, but without describing the scope of her

representation. Dkt Nos. 245-6, 245-7. Seeking to better understand ESC's position, the parties

met and conferred on May 2, 2022. During the call, ESC stated that Gayner had an attorney-client

relationship with ESC, but *only* for subject matter that did not relate to SIE or this lawsuit. Dkt.

No. 246, ¶ 2. SIE documented this exchange in a May 12, 2022 letter to ESC. Ex. 30. ESC never

responded or disagreed with SIE's description of ESC's position.

Contemporaneous with these discussions, ESC, through MABR, asserted objections to the

Gayner subpoena on March 24, 2022, on behalf of *both* Gayner and ESC. Ex. 25. Yet when SIE

asked MABR to confirm it was representing Gayner, MABR backtracked *the very next day* and

said MABR "does not act as engaged legal counsel for Ms. Gayner." Dkt No. 245-9. This was the

*second time* MABR tried to directly interfere with SIE's efforts to contact Gayner by claiming,

and then repudiating, representation. Gayner engaged her own counsel, paid for by ESC, and did

not serve any objections to the subpoena. Ex. 6, at 15:12-17, 19:7-15.

### G.    MABR's Interference with Gayner's Production and Deposition

On May 20, 2022, Gayner made a production of approximately 600 documents to SIE. SIE

ceased review when it came across documents suggesting that Gayner may have been providing

ESC with legal advice concerning the subject matter of this case. Khachatourian Decl., ¶ 2. SIE

proactively advised MABR, and MABR affirmed that it wanted to review Gayner's production for

privilege and that SIE should stop its review. *Id*. ESC then identified approximately 75% of

Gayner's documents as being purportedly privileged. *Id*. But even though ESC was finally

asserting privilege, ESC **_still_** would not take a position as to the scope of Gayner's representation

of ESC. Instead, on May 27, 2022, ESC parsed its language with hypotheticals:

> *If*, after her employment by SIE concluded, Ms. Gayner provided legal advice to ESC
> regarding matters adverse to SIE but were not the same or substantially related to matters
> for which she previously represented SIE as an attorney, Ms. Gayner *would* have been free
> to provide legal advice to ESC.

Dkt No. 245-11 (emphasis added). ESC further obfuscated by suggesting that ESC's privilege

claims for certain unidentified documents *might* be based on Gayner serving as a business advisor

to ESC at the direction of another ESC attorney. Specifically, ESC represented that there *could* be:

> [d]ocuments relating to matters for which Ms. Gayner served as a business advisor to ESC
> and interacted with or acted at the direction or instruction of ESC's legal counsel. In some

matters, *Ms. Gayner may believe* that she was acting as a business advisor or consultant to ESC (although *ESC may have had a different understanding*, believing Ms. Gayner was *also* acting as a legal advisor).

*Id.* (emphasis added). Once again, MABR's parsing stands out as ESC continued to refuse to take a definable position as to its relationship with Gayner. Further, while MABR and ESC were belatedly asserting privileges, MABR was repeatedly emailing Gayner's counsel and suggesting that he postpone Gayner's deposition. Dkt No. 245-12.

Despite ESC's attempts at delay, Gayner's first day of deposition proceeded on June 1, 2022, during which Gayner testified that at times she was acting as ESC's attorney, but other times she did not act as legal counsel for ESC but as a "friend." *See e.g.* Ex. 6, at 52:20-53:2, 100:9-11. When asked if she was "acting in an attorney capacity when [she was] assisting Mr. Scarecrow with drafting the [July 2019] letter," Gayner responded unequivocally, "No," and testified that she wrote the July 2019 letter "together" with ESC, and helped him with the letter "[a]s his friend." Dkt. No. 277, at 14:6-8. However, subsequent document production showed that Gayner understood ███████████████████████████████████████████████ ██████████████████████████████████████ Gayner wrote, on April 13, 2019:

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████

Ex. 17, p. 7 (emphasis added).

### H.   ESC Finally Takes a Position on Gayner's Role

After nearly *two years* of gamesmanship, on July 18, 2022, ESC finally took an unambiguous position on the scope of Gayner's representation of ESC – that for every entry in the privilege logs, ESC believed Gayner was acting as its attorney, contradicting previous representations. Dkt. No. 245, ¶ 2. This was striking, considering that as recently as *the prior month* in a June 24, 2022 Joint IDC letter brief ESC asserted that Gayner had different roles with ESC: "Gayner's documents may be sorted into three categories, i.e., matters where she served as legal counsel *or advisor* to ESC …." Dkt. No. 229, p. 3 (emphasis added). ESC even told this Court that Gayner was merely ESC's "transactional counsel" – a bald misrepresentation in view of

ESC's position that Gayner prepared documents in anticipation of litigation with SIE and that ESC had previously withheld hundreds of emails with Gayner relating to this dispute, before the Court ordered their production. Dkt. No. 229, p. 4. On August 4, 2022, ESC even filed a declaration from Erick Scarecrow that stated he believed Gayner was his attorney at all relevant times. Dkt. No. 250 ("From my perspective (and necessarily that of ESC), from approximately August 2017 until the present, Ms. Gayner has been engaged as an outside attorney for ESC, providing the legal services and counsel summarized above … .").

## I.    **MABR Continues its Gamesmanship After Court Orders**

In light of MABR's games, SIE moved to compel Gayner to produce additional documents on the basis that ESC had failed to meet its burden to establish privilege. *See* Dkt. No. 277. This Court granted in part SIE's motion on January 30, 2023, finding that ESC "failed to demonstrate that drafts of the July 2019 letter and communications related to the letter are protected by the attorney-client privilege or the work product doctrine," "ESC waived the attorney-client privilege as to communications about Gayner's declaration," and ESC "failed to demonstrate that the attorney-client privilege or the work product doctrine apply to the documents at privilege log entries 00069939 and 00069940," and ordered ESC to produce the affected documents. Dkt. No. 277, p. 24.

On February 6, 2023, ESC produced some of the documents ordered by the Court, but unilaterally determined that certain documents were not subject to the order. SIE then moved to compel on March 15, 2023 (Dkt. No. 284) on the improperly withheld documents, and provided additional briefing at the Court's request on April 25, 2023 (Dkt. No. 290) and May 12, 2023 (Dkt. No. 292). On April 11, 2023, the Court granted in part SIE's motion, finding that ESC's reading of the March 15 order was "overly technical," and ordering ESC to produce all non-privileged communications related to the July 2019 Letter. Dkt. No. 286, p. 2. ESC continued to produce documents through June 20, 2023, though its production remains noncompliant. *See* Dkt. No. 298, p. 3. Regardless, SIE ultimately took Gayner's second day of deposition for August 11.

## J.    **Gayner Remembers Very Little at Her Second Day of Deposition**

On her second day of deposition, Gayner's answer to many questions was ████████

10

1　

2

3

4

5

6

7　This, despite ESC's June 3, 2021 Initial Disclosures, which identified Gayner as a

8　witness likely to have information relevant to the case, including about the "Exclusive Vendor

9　Agreement," Dkt No. 245-17, p. 2.[2]

10　　　　Gayner's lack of recall was persistent and pervasive. For example, Gayner testified that she

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[2] Judge Ryu already determined that ESC's Initial Disclosures "directly contradicts ESC's prior
representation that 'Gayner has no knowledge of this action,' made in ESC's opposition to SIE's
MTS the Gayner declaration." Dkt. No. 277, at 4:17-19.

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISQUALIFY MABR; CASE NO. 3:21-CV-00778-
EMC-DMR

1 ██████████████████████████████████████████

## III.   **LEGAL STANDARD**

California courts decide motions to disqualify counsel under state law. *Paul E. Iacono Structural Eng'r, Inc.*, 722 F.2d 435, 439 (9th Cir. 1983). It is within the discretion of the trial court to disqualify counsel, as an exercise of its inherent powers. *ViChip Corp. v. Lee*, No. C 04-2914 PJH, 2004 WL 2780170, at *1 (N.D. Cal. Dec. 3, 2004) (citing *United States v. Wunsch*, 84 F.3d 1110, 1114 (9th Cir. 1996)). This Court has adopted the California Rules of Professional Conduct ("RPC") at Civil Local Rule 11-4, and attorneys practicing in this Court are required to adhere to those standards. *ViChip*, 2004 WL 2780170, at *1.

### A.   **Breach of Duty of Confidentiality**

RPC Rule 1.6 states: "A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure is permitted by paragraph (b) [containing inapplicable exceptions]." And RPC Rule 1.9(a) states: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed written consent."[3] Rule 1.9 continues, in subsection (c), that a lawyer who formerly represented a client "shall not thereafter," use the information protected by section 6068(e) and RPC 1.6 "to the disadvantage of the former client" except where the RPC or the State Bar Act allow it or where the information has become generally known, and shall not reveal the same information except where permitted by the RPC or the State Bar Act. Furthermore, California Business and Professions Code section 6068(e)(1) states: "It is the duty of an attorney to do all of the following … [t]o maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client."

---

[3] Revised RPC was enacted in November 2018, but the predecessor to Rule 1.9 (former Rule 3-310(E)) was substantially similar: "A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment."

12

Furthermore, the Court has inherent power with respect to improperly obtained information used in litigation. *See U.S. v. Chen*, 99 F.3d 1495, 1504 (9th Cir. 1996). Where, as here, a plaintiff and its attorneys obtain confidential information outside the discovery process from a former employee/attorney and attempt to use confidential information against a defendant, the Court has the authority to take measures necessary to ensure the integrity and fairness of the legal process. *See, e.g.*, *Cargill Inc. v. Budine*, No. CV-F-349-LJO-SMS, 2007 WL 1813762, at *14 (E.D. Cal. June 22, 2007); *Packard Bell NEC v. Aztech Sys. LTD*, No. CV 98-7395 DT (EX), 2001 WL 880957, at *8-9 (C.D. Cal. Jan. 22, 2001); *Huston v. Imperial Credit Commercial Mortgage Investment, Corp.* 179 F. Supp. 2d 1157, 1179-80 (C.D. Cal. 2001). For example, in *Cargill*, the court disqualified defendant's law firm, which had contacts with "a former executive whose work was the subject of a substantially related case and who participated in preparation of defense in that case, who switched sides to assist plaintiffs in that case, and further entered into a separate lawsuit against the former employer" because of the appearance of impropriety. 2007 WL 1813762, at *14; *see also Packard Bell*, 2001 WL 880957, at *8-9 (disqualifying law firm that previously represented former executive of plaintiff, from representing defendant).

## B. Breach of Duty of Candor

Attorneys have a "duty of good faith and candor in dealing with the judiciary." *Pacific Harbor Capital, Inc. v. Carnival Air Lines, Inc.*, 210 F.3d 1112, 1119 (9th Cir. 2000). "A lawyer shall not[] knowingly make a false statement of fact or law to a tribunal." RPC 3-3(a). And California Business and Professions Code section 6068(d) "unqualifiedly require[s] an attorney to refrain from acts which mislead or deceive the Court." *Di Sabatino v. State Bar*, 27 Cal. 3d 159, 163 (1980). "Actual deception is not necessary to prove willful deception of a Court; it is sufficient that the attorney knowingly presents a false statement which tends to mislead the Court." *Davis v. State Bar*, 33 Cal.3d 231, 240 (1983). An attorney also owes a duty of candor to opposing counsel. *Wellons v. PNS Stores, Inc.*, No. 18-CV-2913-DMS-WVG, 2020 WL 12834156, at *6 (S.D. Cal. Jan. 31, 2020). Moreover, "[i]t is settled that concealment of material facts is just as misleading as explicit false statements." *Di Sabatino*, 27 Cal. 3d at 162-63.

1

  **C.**  <u>**Successive Representation**</u>

2

   The purpose of California RPC 1.9 is to "promote an attorney's ongoing duty to keep a

3

former client's information confidential." *ViChip*, 2004 WL 2780170, at *2 (discussing the

4

predecessor to Rule 1.9, Rule 3-310(E)) (internal citation omitted). Therefore, a client's former

5

attorney must be disqualified if a court determines that a "substantial relationship" exists between

6

the current representation and the previous representation. *Jessen v. Hartford Cas. Ins. Co.*, 111

7

Cal. App. 4th 698, 705-06 (2003) (quoting Flatt, 9 Cal 4th at 283) (with substantial relationship,

8

"access to confidential information by the attorney in the course of the first representation … is

9

*presumed* and disqualification of the attorney's representation of the second client is mandatory …

10

.") (emphasis in original). "It is the possibility of the breach of confidence, not the fact of the

11

breach, that triggers disqualification." *Trone v. Smith*, 621 F.2d 994, 999 (9th Cir. 1980); *see also*

12

*Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th 1135, 1144-47 (1999). Indeed,

13

"such information as the attorney may have learned … cannot be unlearned … As counsel, the

14

attorney would have the improperly obtained facts instantly available in his mind in questioning

15

witnesses, making and responding to objections and addressing the court and jury." *Cargill*, 2007

16

WL 1813762, at *13; *see also Packard Bell*, 2001 WL 880957, at *9.

17

   The substantial relationship analysis requires a court to determine whether the attorney had

18

a "direct professional relationship with the former client in which the attorney personally provided

19

legal advice and services on a legal issue that is closely related to the legal issue in the present

20

representation;" if so, this is enough to show the "substantial relationship." *City & Cnty. of San*

21

*Francisco v. Cobra Sols., Inc.*, 38 Cal. 4th 839, 847 (2006); *see also Flatt*, 9 Cal. 4th at 283. The

22

court may not "include an 'inquiry into the actual state of the lawyer's knowledge' acquired

23

during the lawyers' representation of the former client." *Jessen*, 111 Cal. App. 4th at 711. Factors

24

courts should consider include: "the similarities between the two factual situations, similarities in

25

legal questions posed, and the nature and extent of the attorney's involvement with the case and

26

whether he was in a position to learn of the client's policy or strategy." *All Am. Semiconductor*,

27

2008 WL 5484552, at *5. A finding of "substantial relationship" requires "that the information

28

from the prior representation is material to the current representation." *Id.* "[T]he paramount

14

concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar." *Reid v. Costco Wholesale Corp.*, No. 8:23-cv-00255-FWS-JDE, 2023 WL 3432168, at *2 (C.D. Cal. Apr. 20, 2023). The right to counsel of one's choice "must yield to considerations of ethics that run to the very integrity of our judicial process." *All Am. Semiconductor*, 2008 WL 5484552, at *4.

Finally, it is well settled that an attorney's conflicts are imputed. "[W]here an attorney is disqualified from representation, the entire law firm is vicariously disqualified as well." *Henriksen v. Great Am. Savings & Loan*, 11 Cal. App. 4th 109, 114 (1992). This Vicarious Presumption Rule also applies where the disqualified attorney is not employed by the firm a party seeks to disqualify, where confidential information was, or is likely to have been, shared. *See, e.g.*, *Advanced Messaging Techs., Inc. v. Easylink Servs. Int'l Corp.*, 913 F. Supp. 2d 900, 902-03, 912-13 (C.D. Cal. 2012) (granting plaintiff's motion to disqualify firm that was not counsel of record or otherwise associated into case, but "had contact with" disqualified attorney, who had been hired by defendant to temporarily serve as its in-house counsel for intellectual property matters).

## IV.   ARGUMENT

### A.   MABR Should Be Disqualified Because It Knowingly Induced Gayner to Disclose SIE Confidential Information

MABR induced Gayner to disclose SIE's Confidential Information by discussing with her the 2014 MLA and its interpretation, scope, and purpose, and drawing on Gayner's experience as SIE's legal counsel. MABR should be disqualified from representing ESC in this matter, based on Gayner's declaration alone.

#### 1.   Gayner Has a Duty of Confidentiality to SIE, and Received SIE Confidential Information During Her Employment

Gayner owes a duty of confidentiality to SIE. First, an attorney has a duty of confidentiality to its current and former clients pursuant to RPC 1.6 and 1.9 (and its predecessor 3-310(E)), which prohibit an attorney from accepting employment adverse to its current or former client, "where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment." *See also* Cal. Bus. & Prof. Code § 6068(e)(1). Second, Gayner's work during her employment with SIE was, and still is, subject to a

non-disclosure agreement with SIE. *See supra* section II.B;. *see also Cargill*, 2007 WL 1813762, at *14; *Packard Bell*, 2001 WL 880957, at *8-9.

Gayner worked in SIE's legal department as in-house counsel from 1998 to 2007. Dkt. No. 74, ¶ 1; Ex. 5. During this time, she was subject to the duty of confidentiality as in-house counsel to safeguard SIE's Confidential Information, and confidentiality under the NDA. Gayner later moved into the licensing department. Dkt. No. 74, ¶ 1 ("In 2007, I was recruited by Sony's business development department to create a new licensing business unit that was responsible for, among other things, establishing a merchandise licensing program."); Ex. 5. Gayner was still an attorney and still owed SIE a duty of confidentiality. *See Morrison Knudsen*, 69 Cal. App. 4th at 232–33. Here, Gayner's employment with SIE, execution of the NDA, and regular interaction with SIE's legal department, clearly establish that SIE expected Gayner to keep its information confidential. *See Cargill*, 2007 WL 1813762, at *12. Furthermore, Gayner acquired Confidential Information in the course of her employment – including regarding SIE's merchandise license program – that would be "useful" in an action on ESC's behalf. *See infra* section IV.A.2. Indeed, this is why MABR, on ESC's behalf, contacted Gayner and solicited her assistance in this case. *See supra* section IV.A.4. Gayner had a duty of confidentiality to SIE pursuant to both California statute and rules of professional conduct, and the NDA between Gayner and SIE.

When Gayner worked at SIE she received Confidential Information, including knowledge about SIE's merchandise license program and contract negotiation practices, knowledge of how SIE interpreted and applied certain contract terms, and knowledge of the contract terms that SIE had agreed to in the past. Dkt. No. 74, ¶¶ 1-7; Ex. 3, § 17.4(ii). Gayner's responsibilities as Director of Legal and Business Affairs involved, in her own words, drafting, reviewing, and negotiating confidential merchandise licensing agreements. Dkt. No. 74, ¶¶ 1-3; Ex. 5 ("As lead counsel I negotiated, reviewed and drafted all transactional agreements including … content licenses (inbound and outbound), merchandise …"). When she moved into her Director of Licensing role, Gayner was still a licensed attorney, and she continued negotiating confidential agreements. Ex. 6, at 70:6-13, 72:6-9, 73:7-10, 96:6-12; *see also* Dkt. No. 74, ¶ 2 ("During the course of my employment with Sony, and specifically in my role as Director of Licensing, I was

16

involved in the negotiation of hundreds of Peripheral Licenses and Merchandise License Agreements ("MLA")), ¶ 3 ("I created the merchandise licensing program that was in place at Sony in 2014 (when ESC and Sony executed their 2014 MLA ("the 2014 ESC MLA") and I am well familiar with the purpose of the MLAs that were executed around that time because I created the program."). According to Gayner's Linkedin bio, in this role, she "[b]rought in over $100M in licensing revenue," "[e]stablished a licensing department that became the blueprint for all other PlayStation affiliates" "[n]egotiated merchandise licensing deals in Canada, US, Mexico, throughout Central America, Brazil, and Argentina," and "[s]ourced all peripheral & merchandise vendors." Ex. 5. Importantly, as Director of Licensing, Gayner "was involved in the negotiation of the 2014 ESC MLA between Sony and ESC, and [she was] aware of its terms and purpose. [She] executed the ESC MLA on behalf of Sony." Dkt. No. 74, ¶ 7. In deposition, ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████ Ex. 6, at 93:21-94:19, 233:18-20, 236:17-25, 238:11-20, 245:12-15. Gayner also testified that SIE's interpretation of business terms, and information about terms for which there is room for a third party to negotiate with SIE, were confidential. *Id.*, at 93:17-20, 95:4-96:5.

There is no dispute that the information Gayner received at SIE – about SIE's merchandise license agreements, and SIE's associated policies and procedures – is confidential. First, the 2014 MLA contains a confidentiality clause. Ex. 3, § 8.1. Second, all Parties in this case have agreed to seal information regarding the 2014 MLA when included in filings, including Gayner's declaration regarding the MLA. *See, e.g.*, Dkt. Nos. 24, 33, 37, 47, 53, 54, 67, 78, 95, 96, 98, 103, 106. Third, Gayner herself testified that this information was confidential. Ex. 6, at 93:17-94:19, 95:4-96:5, 233:18-20, 236:17-25, 238:11-20, 245:12-15. Gayner was thus in possession of SIE's Confidential Information.

### 2.     Gayner Disclosed SIE's Confidential Information to MABR.

As discussed above, the Gayner declaration itself, which was drafted by MABR, reveals on its face the disclosure of SIE Confidential Information to MABR.  Additionally, ESC further underscored this disclosure in it's own words: Gayner, in her declaration, was "testifying about

17

1   her personal knowledge concerning the MLA" and ███████████████████████████

2   ██████████████████ "based on her own personal knowledge." Dkt. No. 104, at 2:8-11; *see also*

3   *id*. at 10:14-21 ████████████████████████████████████████

4   ████████████████████████████████████████████████████████████

5   ██████████████████████████. Again, this necessarily involved disclosure of SIE

6   Confidential Information to MABR, the drafters of the declaration. This scenario has created a

7   taint that can only be remedied by disqualification of MABR. *See, e.g.*, *Cargill*, 2007 WL

8   1813762, at *13 ("such information as the attorney may have learned … cannot be unlearned …

9   "); *Packard Bell*, 2001 WL 880957, at *9 (disqualification serves "useful purpose of eliminating

10  from the case the attorney who could most effectively exploit the unfair advantage."). At the most

11  basic level, Gayner's declaration alone shows that Gayner disclosed SIE Confidential Information

12  to MABR. (Dkt. No. 74, ¶¶ 4-7).

13              **3.    MABR Improperly Received SIE's Confidential Information**

14  As shown above (*supra* section IV.A.1-2), MABR is in possession of SIE's Confidential

15  Information, and induced Gayner to disclose such information. MABR has had knowledge that

16  SIE was concerned about Gayner's disclosure of SIE Confidential Information at least since SIE

17  filed its September 15, 2020 MTS. Dkt. No. 85; Ex. 27. Rather than remedying the problem,

18  MABR ***doubled down*** after SIE complained, opposing the MTS and spending three years trying to

19  hide Gayner's adverse representation of ESC.

20  Furthermore, MABR and ESC induced Gayner to disclose Confidential Information. In

21  August and September 2020, MABR was emailing and having phone calls with Gayner regarding

22  the drafting of her declaration. ████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████

24  ███ MABR and Gayner exchanged redlines over August 31, 2020 and September 1, 2020. Ex. 22;

25  Ex. 23. And, MABR and Gayner discussed the declaration on calls on at least August 28, 2020

26  (Ex. 21), August 31, 2020 (Ex. 22), and September 1, 2020 (Ex. 23). MABR even held a call with

27  Gayner after SIE submitted her NDA along with its MTS, on September 15. *Compare* Dkt. No.

28  88-5 *with* Ex. 24. Despite SIE's counsel's requests that MABR disclose all communications and

1   documents exchanged with Gayner and agree to cease communicating with her regarding the case,

2   MABR never agreed to. Dkt. No. 109-1. The Court should disqualify MABR.

   **B.      MABR Should be Disqualified Because Gayner Successively Represented Adverse Parties, and this is Imputed to MABR**

   1.       **Gayner Represented SIE, and ESC, in Substantially Related Matters**

   (a)       **Gayner's Representation of, and Work for, SIE Adverse to ESC**

   Gayner drafted the substance of the standard agreement used for merchandise license

   agreements at SIE. Gayner also negotiated, reviewed and signed the 2014 MLA at issue in this

   case. Ex. 6, at 128:22-129:1, 72:23-73:1, 251:1-4; Dkt. No. 74, ¶ 7. Gayner has further admitted

   that when she worked at SIE, she negotiated **_hundreds_** of merchandise license agreements. Dkt.

   No. 74, ¶ 2; *see also supra* section II.B. In fact, Gayner **_created_** the merchandise license program

   at SIE. Dkt. No. 74, ¶ 3; Ex. 6, at 129:2-9. Gayner was still an attorney after she became the

   Director of Licensing. Indeed, Gayner testified that she continued negotiating merchandise license

   agreements and working with SIE's legal team as Director of Licensing. *See supra* section II.B.

   Her responsibilities as Director of Licensing included negotiating and executing the 2014 MLA,

   together with SIE's legal team. *Id*. As established above, Gayner received SIE Confidential

   Information regarding SIE's merchandise license program, and had knowledge about SIE's

   associated policies strategies and procedures. *See supra* section II.B; *see also Global Van Lines,

   Inc. v. Superior Court*, 144 Cal. App. 3d 483, 488-90 (1983); *Farris v. Fireman's Fund Ins. Co.*,

   119 Cal. App. 4th 671, 685, 688-89 (2004) (disqualifying attorney that previously worked as

   coverage attorney for insurance company, because attorney was "instrumental in formulating those

   strategies and philosophies," and provided advice the company relied on to "develop, modify and

   interpret [its] practices, policies and procedures related to coverage questions and disputes.").

   It is of no moment that Gayner was employed as Director of Licensing when she

   negotiated the 2014 MLA. In fact, SIE placed her in the Director of Licensing role in part because

   of her experience as an attorney, which included merchandise agreements Ex. 32. In one case,

   where the party seeking disqualification could not prove that the attorney with the purported

   conflict had worked as its general counsel, that did not matter – the attorney's work drafting and

1   negotiating two agreements was enough to support disqualification because this demonstrated that

2   he had a direct professional relationship with the company, and had provided legal advice and

3   services. *Zurich Am. Ins. Co. of Ill. v. VForce Inc.*, No. 2:18-CV-02066-TLN-CKD, 2021 WL

4   1193963, at *5-7 (E.D. Cal. Mar. 30, 2021).

5               **(b)      Gayner's Representation of ESC Materially Adverse to SIE**

6          After leaving SIE, Gayner represented ESC, materially adverse to SIE, on substantially

7   related matters – the exact kind of situation disqualification is intended to address to "preserve

8   [the] public trust." *Reid*, 2023 WL 3432168, at *2 . In 2017, Gayner began advising ESC on its pin

9   program proposal. At the same time, Gayner drafted the Term Sheet. Ex. 8, p. 1 ("Discussion of . .

10  . negotiation strategy and advise relating to Sony pin program"), p. 2 ("Discussion of . . . advice

11  relating to draft Sony pin program term sheet";"Communication with counsel seeking advice

12  regarding draft Sony pin program term sheet";"Draft of Sony pin program term sheet"), and p. 3

13  ("Discussion of revisions to draft Sony pin program term sheet"); Ex. 9 ███████████████

14  ████████████████████████████████████████████

15         The record further reveals that Gayner appears to have given ESC suggestions on what to

16  say to SIE and was blind copied on communications with SIE. For example, Gayner coached ESC

17  on how to negotiate the terms, and present a draft Term Sheet, to SIE. Ex. 1, p. 39 ████████████

18  ████████████████████████████████████████████

19  ████████████████████; Ex. 4; Ex. 8, pp. 2-3. Gayner also testified that after

20  she left SIE, she began advising ESC on interpretations of the 2014 MLA. Ex. 6, at 56:6-21,

21  57:17-20. ESC's privilege log entries corroborate this. Ex. 8, p. 12 ("Fwd: Sony 2014 Agreement

22  – referenced in the Termination Notice," attaching 2014 MLA, and described as "Discussion

23  regarding response to Sony notice of non-renewal.").

24         Additionally, Gayner has assisted ESC in this litigation materially adverse to SIE. She

25  communicated with ESC regarding "potential legal issues and claims against" SIE. Ex. 8, pp. 4-6.

26  Gayner also was involved in drafting the July 2019 Letter for ESC, describing ESC's ██████

27  ██████████████████ Ex. 13. In drafting this letter, ██████████████████

28  ██████████████████ Ex. 16. And, she connected ESC to damages consultant

                                                    20

1  Napper to assist with ESC's ███████████████████ Ex. 11, at 389:11-22; Ex. 12; Ex. 8, at p.

2  21. Finally, Gayner directly appeared materially adverse to SIE when she filed a declaration in this

3  case in support of ESC (Dkt. No. 74), and assisted MABR with respect to SIE's MTT (Ex. 24).

4  Gayner's materially adverse representation of ESC has and will cause harm to SIE.

        **(c)**      **Gayner's Representation of ESC Materially Adverse to SIE was on Substantially Related Matters, so MABR's Access to SIE Confidential Information is Presumed**

7         It is indisputable that the 2014 MLA, SIE's policies and procedures, and the pin program

8  negotiations are substantially related to the allegations raised in this lawsuit. ESC argues that its

9  claims relate to a "new" agreement: the EVA. Dkt. No. 99, pp. 4-9. But this ignores the fact that

10  many of SIE's defenses are focused on argument that the purported EVA is covered by the 2014

11  MLA. Dkt. No. 25, pp. 5-9, 12-13; Dkt. No. 51, pp. 1-7, 9-10. And at a most basic level, this case

12  involves the same parties to the 2014 MLA – SIE and ESC. And, ESC (having been advised by

13  Gayner), treated the purported EVA as "Confidential Information as defined in the Merchandise

14  License Agreement." Ex. 4. ESC also relied on Gayner's declaration in opposition to SIE's MTT

15  (Dkt. No. 71), and appears to have relied on revelations from her declaration in its opposition to

16  motion to dismiss (Dkt. No. 40, at 4:21-23, 6:3-22, 7:7-15, 7:17-18).

17         Furthermore, ESC submitted Gayner's declaration to rebut SIE's defenses and to bolster its

18  case, by disclosing her views on the purpose of the 2014 MLA, how it would be interpreted, and

19  its boundaries. Likewise, ESC has sought discovery on the 2014 MLA and the Parties' course of

20  conduct, and references the 2014 MLA in its Complaint a total of nine times. *See* Compl., ¶¶ 42-

21  46; Ex. 29, No. 6; Dkt. No. 25, pp. 6:8-15. Whether the 2014 MLA would cover the pin program

22  by itself or through amendment is central subject matter in this case. *See* Dkt. No. 25, at 6:28-7:11.

23  Despite the clear connection between this matter and Gayner's role at SIE, Gayner failed to seek a

24  waiver from SIE for her successive representation of ESC. Thus, because this case is substantially

25  related to Gayner's prior representation of SIE, ESC's and MABR's access to SIE's Confidential

26  Information is ***presumed***. *Jessen*, 111 Cal. App. 4th at 705-06.

      **2.**      **Gayner's Conflict is Imputed to MABR**

28         The taint from Gayner's conflict is imputed to MABR, which has worked directly with

Gayner regarding this lawsuit and is presumed to have had access to SIE Confidential Information. It is well settled that courts impute an attorney's conflict to their law firm. *Henriksen*, 11 Cal. App. 4th at 114; *Advanced Messaging Techs.,* 913 F. Supp. 2d at 909-10 ("The general rule is that presuming an attorney possesses confidential information requires presuming the same for his law firm ('the Vicarious Presumption Rule.')"). But the Vicarious Presumption Rule does not stop at imputation to a conflicted attorney's own law firm. An attorney's conflict may also be imputed to attorneys with whom they directly work on a particular matter.

In *Pound*, the California court of appeals disqualified an attorney (Jones) with whom an attorney (Bradley) associated as counsel. 135 Cal. App. 4th at 81 (reversing lower court's order denying motion to disqualify plaintiff's attorney). Bradley had previously obtained confidential information about defendants from Smith, a previous attorney for defendant DDC and agent of co-defendants (Howard and Mark). *Id*. at 74, 76. The court determined that "the trial court had no choice but to disqualify Bradley" after concluding Bradley obtained confidential information about defendants from Smith. *Id*. The court then determined that "this case [w]as essentially identical to those cases involving attorneys changing law firms, from one side (plaintiffs) to the other (defendants) during the pendency of a case." *Id*. at 76. And while "[t]he only possible distinction [wa]s that Bradley was not a member or associate of either Smith's firm or Jones's firm" and was "an independent attorney," in the court's "view there [wa]s no logical or substantive manner to distinguish the two situations." *Id*. at 77. In fact, even if Bradley had never associated into the case, "it [wa]s impossible [for the court] to conceive a justification for not disqualifying Jones when he **_consulted with_** Bradley, an attorney who obtained the opponent's confidences … ." *Id*., at 78-79 (emphasis added).

In *Advanced Messaging Technologies*, the court extended Pound to apply where the tainted attorney, whose conflict was imputed to a party's counsel, was not co-counsel of record for the party or otherwise associated into the case. The court granted defendants' motion to disqualify plaintiff's law firm (Perkins) in a patent case where the law firm had contact with an attorney serving as in-house counsel for one defendant in intellectual property matters, where that attorney had previously worked on three of the four patents at issue in the litigation at a prior law firm, on

22

1    behalf of plaintiff. 913 F. Supp. 2d at 905, 910. The attorney had been hired by Perkins to serve as

2    "outside in-house counsel" for intellectual property matters for Perkins' client, but he, nor his law

3    firm, had appeared as counsel in the litigation, or otherwise associated in as co-counsel. The court

4    rejected defendants' argument that the attorney "played a limited role" in the litigation, noting that

5    "cases do not analyze how much work a tainted attorney performed in the cases for which

6    disqualification is sought," because of the Vicarious Presumption Rule. *Id.* at 910.

7         As a final example, an attorney at plaintiff's law firm Eagan Avenatti had previously

8    represented defendant. *Beltran*, 867 F. Supp. 2d at 1078. The attorney's conflict was imputed to

9    his law firm Eagan Avenatti. *Id.* at 1083. The court in turn disqualified the law firm X-Law Group,

10   who had "collaborated with Eagan Avenatti in the filing of the complaint." *Id.* at 1084.

11        Here, Gayner worked directly with MABR on the drafting of Gayner's declaration filed on

12   behalf of ESC in opposition to SIE's motion, and in opposing SIE's MTS. Ex. 22 ("Thank you

13   very much for your help. We appreciate it and we know that Erick is extremely appreciative.");

14   Ex. 24; *see also* section II.D. ESC has stated that for all documents on Gayner's privilege log,

15   (*i.e.*, where ESC claimed attorney-client privilege or work product), Gayner was acting as ESC's

16   attorney. Dkt. No. 245, ¶ 2. Further, ESC has testified that "[a]s part of her engagement by ESC,

17   Ms. Gayner did advise and assist ESC in connection with ESC's work and negotiations with

18   Sony," which necessarily would include during the late August-early September 2020 timeframe

19   that Gayner drafted her declaration. Ex. 8, pp. 32, 35. This dispute obviously involves the same

20   parties, and MABR knew, or must have known, Gayner was ESC's attorney, and formerly SIE's

21   attorney – not just a third party witness assisting ESC – at the time they approached her to draft

22   the declaration. This level of contact and collaboration between ESC's attorneys Gayner and

23   MABR is analogous to *Pound*, *Beltran*, and *Advanced Messaging Technologies*, where conflicted

24   attorneys' collaboration with a party's counsel in a case imputed the conflict to the party's

25   counsel, even where the conflicted attorney was not employed by the party's counsel. Thus,

26   Gayner's conflict must be imputed to MABR under the Vicarious Presumption Rule.

27        **C.    The Appearance of Impropriety Also Necessitates Disqualification**

28        Disqualification of MABR is necessary due to the  impropriety of her involvement in this

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISQUALIFY MABR; CASE NO. 3:21-CV-00778-
EMC-DMR

1   case, and MABR's solicitation and attempted cover up of that involvement. *Trone*, 621 F.2d at

2   999-1000; *SpeeDee Oil*, 20 Cal. 4th at 1144-47; *Beltran*, 867 F. Supp. 2d at 1084 ("Even if the X-

3   Law Group did not, in fact, acquire confidential information, their involvement in the case would

4   taint the appearance of probity and fairness of the proceedings."). Through their misinformation

5   campaign to hide the truth rather than cooperate (*see supra* sections II.D-I), ESC and its attorneys

6   have violated their duty of candor to the Court and to SIE.

7         **D.**    <u>**ESC Will Not Be Prejudiced by MABR's Disqualification**</u>

8        In a motion to disqualify, the Court may consider factors, such as whether disqualification

9   would result in prejudice to the nonmoving party. Here, ESC can establish no such prejudice. ESC

10   has not had any difficulty engaging attorneys, and should not in the future. Furthermore, any

11   purported prejudice to ESC would be minimal because substantive litigation in this case is still in

12   its early stages. Since the MTT briefing shortly after the filing of the complaint, this litigation has

13   involved only Gayner's improper representation of ESC and disclosure of SIE Confidential

14   Information. *See, e.g.*, *Beltran*, 867 F. Supp. 2d at 1084 (minimal prejudice to plaintiff for

15   disqualification of his attorneys "given the early stage of the litigation" where defendant notified

16   plaintiff of its intention to move to disqualify shortly after the suit was filed, the only motions filed

17   were motions to dismiss and strike the FAC, and it did not appear the parties had engaged in

18   significant discovery). The Parties have engaged in minimal discovery unrelated to the Gayner

19   dispute. *See* Dkt. No. 294, at 2:12-23; *see also* 2:24-26 (asking the Court to lift the stay "to allow

20   ESC to take discovery and the Action advanced to the stage where meaningful mediation efforts

21   can be undertaken or ESC's claims can be adjudicated on the merits."). Indeed, ESC agreed to stay

22   this case in order to minimize prejudice to it. Dkt. No. 239. ESC's right to counsel of its choice

23   must be balanced against "the need to maintain ethical standards of professional responsibility,"

24   and here, where the facts are so egregious, that right must yield to the "paramount consideration"

25   of "preservation of the public trust in the scrupulous administration of justice and the integrity of

26   the bar." *All Am. Semiconductor*, 2008 WL 5484552, at *4.

27   **V.**    <u>**CONCLUSION**</u>

28        For the reasons stated above, SIE's Motion should be granted.

1

2

3

4  Dated: September 7, 2023

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

KXT LAW, LLP


By:  */s/ Karineh Khachatourian*
Karineh Khachatourian
Rachael C. Chan
Oren J. Torten

Attorneys for Defendant,
Sony Interactive Entertainment LLC