UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ESC-TOY LTD.,

Plaintiff,

v.

SONY INTERACTIVE ENTERTAINMENT LLC,

Defendant.

Case No. 21-cv-00778-EMC

**ORDER DENYING SANCTIONS AND MOTION TO MODIFY PROTECTIVE ORDER**

Docket Nos. 496, 505

## I.    INTRODUCTION

This Order addresses two related matters arising from a long-running dispute over the conduct of ESC-Toy ("ESC"), Erick Chatel (also known as "Erick Scarecrow"), and Shelly Gayner, a former in-house attorney for Defendant Sony Interactive Entertainment LLC ("SIE"). Ms. Gayner was employed by SIE from 1998 until 2014 and, in 2017, retained by ESC in connection with its negotiations over an alleged Exclusive Vendor Agreement ("EVA") with SIE. The EVA concerned a proposed "PlayStation Pin Program," under which ESC would serve as SIE's exclusive global vendor for collectible pins used largely for marketing purposes.

The first matter for the Court to resolve is the issue of dispositive sanctions sought by SIE — either terminating sanctions or issue preclusion sanctions striking ESC's breach of contract claim. *See* ESC Brief re Sanctions (Dkt. 472-1) at 3 ("The Court should . . . strike ESC's First (Breach of Oral Contract), Third (Breach of Implied Covenant of Good Faith and Fair Dealing), and Fourth (Breach of Written Contract) claims in the Complaint."). The Court issued an Order to Show Cause ("OSC") on March 30, 2026, directing SIE to demonstrate, for each of nine detailed summaries of Ms. Gayner's advice to ESC, that the advice *both* (a) was based on information that was non-public and/or not readily ascertainable by ESC through ordinary diligence as a

sophisticated industry player and transactional counterparty, *and* (b) materially advantaged ESC's negotiating position with respect to EVA or reasonably affected the terms of the EVA in ESC's favor. These questions bear directly on whether terminating or issue preclusion sanctions are warranted on the basis of "transactional taint."

The second matter for the Court to resolve is ESC's Motion to Modify the January 2024 Protective Order which bars ESC and its counsel from accessing any materials prepared by or received from Ms. Gayner concerning this case or her knowledge of SIE-related matters.

Both issues arise against the backdrop of the Court's November 2023 Disqualification Order, which disqualified ESC's former counsel, Maschoff Brennan ("MABR") on the basis of litigation misconduct. Specifically, the Court identified Ms. Gayner's improper collaboration with MABR in preparing and drafting a declaration for use in this litigation as "litigation taint," because it drew on her insider information of SIE's operations derived from her employment as in-house counsel for SIE which was and is adverse to ESC in the litigation at bar. The Protective Order followed from that Disqualification Order and its underlying logic.

The present disputes require the Court to distinguish between two analytically distinct categories of conduct: (1) Ms. Gayner's involvement in this litigation, which has already been adjudicated ("litigation taint"); and (2) Ms. Gayner's transactional advice to ESC during the EVA negotiations, before the litigation was initiated, which is the subject of a prior Special Master investigation and the Court's OSC (purported "transactional taint"). The former already triggered the disqualification of MABR and entry of the Protective Order. The latter gave rise to SIE's request for either terminating sanctions or an issue preclusion sanction striking ESC's breach of contract claim against SIE. As discussed in this Order, terminating or issue preclusion sanctions must be premised on certain factual findings not present here.

For the reasons set forth below, the Court concludes that SIE has not carried its burden under either prong of the OSC framework with respect to any of the instances of Ms. Gayner's advice that the Court identified. SIE's submissions conflate information that was "confidential" in an employment or ethical sense with information that was genuinely not known or easily knowable by ESC, a sophisticated industry actor with nearly a decade of direct dealing with SIE.

Moreover, SIE has not presented any evidence to warrant a reasonable inference by the Court that Ms. Gayner's advice was material to the transaction — material, for purposes of an issue preclusion sanction, as defined by that which likely affected the terms of the EVA in ESC's favor.

Accordingly, terminating or issue preclusion sanctions are not warranted on this record. ESC may proceed with its substantive claims against SIE. With respect to the Protective Order, the Court declines to grant ESC's requested modification but clarifies that the Protective Order's operative scope only extends to materials bearing on litigation taint. The parties are directed to meet and confer regarding which Gayner materials fall outside the Protective Order's scope.

## II.     BACKGROUND

### A.     ESC and SIE's Commercial Relationship

#### 1.     Pre-EVA Commercial Relationship

ESC specializes in the design, manufacture, and distribution of collectible merchandise for the video game and entertainment industries. Complaint (Dkt. 1) ¶¶ 1, 10–11. ESC's client base is made up of major video game publishers, including Defendant SIE. *Id.* ¶¶ 14, 26–49.

The commercial relationship between ESC and SIE began in 2009. The parties entered into a confidentiality and non-disclosure agreement followed by a consulting agreement in April 2009. *Id.* ¶ 27, 33. Under those agreements, ESC would design and manufacture merchandise inspired by certain PlayStation titles, beginning with vinyl figures of the character Nathan Drake for the *Uncharted* franchise. *Id.* ¶¶ 38–39. This line of merchandise proved commercially successful, and the parties formalized their relationship in 2014 with a Merchandise Licensing Agreement ("MLA"), which authorized ESC to design, manufacture, and sell merchandise associated with certain PlayStation titles. *Id.* ¶¶ 42–44. Over the following years, ESC's licensing portfolio with SIE expanded to cover 16 video game titles by 2019. *Id.* ¶ 55.

The commercial relationship between ESC and SIE spanned nearly a decade, was governed by multiple formal agreements, and involved direct contact between ESC and SIE attorneys and other staff. *See* Motion to Modify PO at 3. This background is critical to the dispute — by the time Mr. Scarecrow negotiated the EVA at issue in the instant case, he was familiar with not only the general domain of video game licensing and product development, but

also SIE's specific operational practices, contracting preferences, and commercial culture. *See* Scarecrow Declaration (Dkt. 497) ¶¶ 3–22, 32–37, 52–53. Mr. Scarecrow negotiated and performed under the consulting agreement and two separate MLA agreements, participated in agreements with SIE across numerous projects, worked with SIE's licensing and marketing staff on individual titles, and observed SIE's behavior as a counterparty to numerous commercial deals. *Id.* ¶¶ 15–22 (describing history of business relationship with Sony, including numerous agreements such as 2009 Statement of Work, 2011 MLA, 2011 Statement of Work, and a 2014 MLA). This commercial history entirely pre-dates Ms. Gayner's engagement with ESC. *Id.* ¶¶ 19, 24–25.

### 2.     The Pin Program Pitch and Exclusive Vendor Agreement

ESC developed a comprehensive PlayStation Pin Program proposal tailored for SIE, which it pitched to SIE personnel beginning in Summer 2017. Complaint ¶¶ 67–68. SIE's response was reportedly positive. According to ESC, in September 2017, an SIE product manager (Brian Miller) informed Scarecrow that he had obtained approval from the PlayStation Marketing Department to begin developing pins. *Id.* ¶¶ 71–73. On October 2, 2017, ESC alleges that it and SIE entered into an oral Exclusive Vendor Agreement ("EVA"), under which SIE granted ESC the exclusive right to serve as the Global Master Vendor for the PlayStation Pin Program, in exchange for ESC's agreement not to pitch a competing pin program to SIE's competitors. *Id.* ¶ 74. ESC thereafter invested substantial resources in developing the pin program, including design work, factory sourcing, and physical prototypes. *Id.* ¶¶ 77–79.

In April 2018, Miller informed Scarecrow that SIE would not use ESC for a Pin Program. *Id.* ¶ 81. SIE then began issuing exclusive collectible pins with video game pre-orders — allegedly matching the commercial model that ESC had proposed. *Id.* ¶¶ 83–88. This conduct is the basis for ESC's complaint.

### B.     Ms. Gayner's Engagement with ESC

From 1998 to 2007, Ms. Gayner worked as in-house counsel for SIE as the Director of Legal and Business Affairs. Gayner Declaration ¶¶ 1–3. In this role, she acted as lead counsel for SIE, reviewing and drafting transactional agreements. Gayner Dep. 69:16-19. On January 5,

United States District Court
Northern District of California

1998, Ms. Gayner signed a nondisclosure agreement ("NDA"), which stated that she was not permitted "at any time, either during or subsequent to [her] employment, [to] disclose to any other person or company any information, knowledge or data [she] receive[d] or develop[ed] during [her] employment which is considered proprietary to [Sony Computer Entertainment America, Inc.] …" Khachatourian Decl. (Dkt. 317), Ex. 27 at 8.

Ms. Gayner later moved to SIE's business development department, where she served as Director of Licensing from 2007 to 2014. Gayner Declaration ¶¶ 1–3. Ms. Gayner "establish[ed] the merchandise licensing program" as the Director of Licensing and negotiated merchandise licensing agreements in that role. *Id.*; Gayner Dep. 72:6-9. At Ms. Gayner's deposition, she testified that she only handled the business side, negotiating the business terms of the licensing agreements. *Id.* at 72:11-14. Though she did not negotiate legal instruments in that role, she interacted with SIE's legal department, "[p]robably almost every day." *Id.* at 72:11–13. Ms. Gayner left SIE in 2014 to join GNS Games. Gayner Dep. 18:14.

Mr. Scarecrow and Ms. Gayner first met in May 2009 when she was working for SIE. They remained in contact after Ms. Gayner left SIE in 2014. Mr. Scarecrow considers her "a personal friend." Scarecrow Declaration (Dkt. 240) ¶¶ 1, 5, 9.

Beginning around 2017, ESC retained Ms. Gayner for advice in connection with its Pin Program pitch to SIE. The precise nature and scope of her role are disputed, and Mr. Scarecrow's account of it has shifted over time. What is confirmed, based on the record before the Court, is that Ms. Gayner reviewed drafts of ESC's Pin Program pitch deck and term sheet, provided general advice about what terms to seek, communicated with Mr. Scarecrow by email and phone with some regularity during the relevant period, and was kept apprised of Mr. Scarecrow's conversations with SIE personnel regarding the Pin Program.

Two features of this engagement are particularly noteworthy. ***First***, Mr. Scarecrow concealed Ms. Gayner's involvement from SIE during negotiations. The Special Master's review of the contemporaneous record confirmed that Scarecrow "on at least two occasions in emails to Ms. Gayner, expressed his interest in keeping the fact that he had hired Ms. Gayner secret from SIE." Special Master Report at 8. ***Second***, ESC's legal counsel, Innes Smolansky, appears to

have been largely excluded from the substantive Pin Program communications with Ms. Gayner. The Special Master found that Ms. Smolansky "was not included in the emails, in the relevant time period, between Mr. Scarecrow and Ms. Gayner," and that Scarecrow communicated about the Pin Program almost exclusively with Ms. Gayner during the relevant period. *Id.* at 7–8.

SIE eventually became aware of Ms. Gayner's involvement. In August 2019, Ms. Gayner attended a call between ESC and SIE, during which SIE's counsel Dan Herp asked Ms. Gayner to leave the call. Scarecrow Declaration ¶¶ 48–49. Mr. Scarecrow describes confusion as to "why Sony was asking ESC's attorney to leave." *Id.* ¶ 49. In other words, Gayner's involvement with ESC appears to have consisted of more than mere assistance as "personal friends." *Cf.* Disqualification Order at 4 (Gayner describing a letter she wrote to Herp in 2019 and stating that "she was 'not acting in an attorney capacity'; rather, she helped him with the letter '[a]s his friend'").

## C. Disqualification of Maschoff Brennan and Entry of Protective Order

Ms. Gayner was involved not just with ESC's pre-litigation negotiations with SIE, but with the active litigation between ESC and SIE too. In September 2020, Ms. Gayner submitted what was styled as a non-party fact witness declaration in support of ESC's brief in opposition to SIE's motion to transfer venue. Disqualification Order (Dkt. 335) at 11–14. The declaration was a product of her sustained collaboration with ESC's litigation counsel, MABR. The record reflects that she attended at least three preparatory calls with MABR, participated in at least five rounds of revisions, and exchanged at least twelve emails with MABR attorneys leading up to the declaration's filing. Motion to Disqualify (Dkt. 315-4) at 5–6. MABR did not disclose that Ms. Gayner was acting as ESC's attorney, and the declaration was presented as though she were a neutral former SIE employee with independent knowledge. The Court found that the declaration contained "insider knowledge about the innerworkings of SIE's MLAs gained from her role as counsel for SIE" that "should not have been shared with SIE's adversary." Disqualification Order at 14.

In 2023, the Court granted SIE's motion to disqualify MABR on the basis of litigation taint arising from Ms. Gayner's improper and unethical involvement in the active litigation on ESC's

behalf against her former employer on matters on which she had dealt. Disqualification Order. The Court found that Ms. Gayner's successive representations of SIE then ESC were substantially related, that she had access to SIE's privileged and confidential information during her tenure with SIE, and that she had in fact shared information with MABR in connection with this litigation — most problematically by collaborating with MABR to draft the 2020 Gayner Declaration, which the Court found to contain "insider knowledge about the innerworkings of SIE's MLAs gained from her role as counsel for SIE" that "should not have been shared with SIE's adversary, ESC, and its counsel, MABR." *Id.* at 14. The Court further found a basis for disqualification due to the appearance of impropriety arising from Ms. Gayner's sustained work with MABR on litigation strategy in a matter in which she previously represented the adverse party. *Id.* at 15–18. Additionally, the Court found that both MABR and ESC had "repeatedly changed their position regarding the relationship with Ms. Gayner" and had "breached their duty of candor" to the Court. *Id.* at 20–21. The Court's Disqualification Order focused on Ms. Gayner's conduct in the litigation itself and her role in representing and assisting ESC in this litigation, rather than on any transactional advice she previously provided to Mr. Scarecrow during the 2017 negotiations of the EVA. That transactional advice is the subject of the present Order.

Following MABR's disqualification, ESC obtained substitute counsel. The law firm Call & Jensen appeared on behalf of ESC in June 2024, approximately seven months after the Disqualification Order was issued. Notice of Appearance (Dkt. 379). Beginning in early-2026, Paul Steiner and Frank Sommers also appeared on behalf of ESC. Notice of Association (Dkt. 487).

In 2024, the Court entered the Protective Order (Dkt. 369) that is the subject of ESC's present Motion to Modify Protective Order (Dkt. 497). The Protective Order bars ESC and its counsel from (1) contacting or communicating with Ms. Gayner to discuss this case, its factual background, or her knowledge of SIE-related matters; (2) possessing or relying upon any documents, materials, or information prepared by or received from Ms. Gayner that concern this case, its factual background, or her knowledge of SIE-related matters, including any materials she

contributed to preparing; and (3) relying on any such materials for any purpose in this case.[1]  *Id.* at 1–2.

**D.**     **Special Master Proceedings**

In 2025, in connection with this Court's effort to determine whether an issue preclusion/terminating sanction was warranted, the Court appointed retired California Supreme Court Chief Justice Tani G. Cantil-Sakauye as Special Master to address four questions arising from the Gayner dispute: (1) whether Ms. Gayner advised ESC on negotiations regarding the EVA, (2) whether Ms. Gayner provided ESC with confidential or privileged SIE material or information in connection with those negotiations, (3) whether such information gave ESC a material transactional advantage in negotiating the EVA, and (4) whether there was a presumption of transactional taint based on missing documents.[2]  Order Appointing Special Master (Dkt. 435); Special Master Report (Dkt. 479-3).  The Special Master was not asked to make a determination about whether sanctions are warranted, and the Report makes no such recommendation.  *See id.*

On the first question, the Special Master found that Ms. Gayner advised ESC on the Pin Program negotiations.  Special Master Report at 2–3.  She described Ms. Gayner and Mr. Scarecrow as being in "daily contact, via email and phone calls, . . . regarding the development of the Pin Program for SONY and subsequent issues."  *Id.* at 3.  The Special Master found that Mr. Scarecrow "incorporated all of Ms. Gayner's advice" into various versions of the Pin Program pitch and terms that were submitted to SIE, including advice "to seek an exclusivity provision and hourly and royalty fees among other more generic recommendations."  *Id.* at 2.  The Special Master noted that Ms. Gayner "advised as to what would be important to SONY and provided background on former SONY practices," including advice about SIE events, merchandising practices, manufacturing capabilities, and general advice on how to improve the Pin Program

[1] The Protective Order also struck the Gayner Declaration from the record, rendered Ms. Gayner's testimony inadmissible if offered by ESC, and required MABR to destroy all communications reflecting information provided by Ms. Gayner about SIE-related matters.  *Id.*

[2] The Special Master conducted her review using a database of documents compiled by a digital forensics and e-discovery specialist, Michael Garlie, and designated by identification numbers with the prefix: "SGT."  *Id.*

<div style="margin-left:auto">United States District Court<br>Northern District of California</div>

pitch.  *Id.* at 3.  Ms. Gayner's specific advice to Mr. Scarecrow included:

– That SIE's standard practice was to avoid exclusivity arrangements but that requesting exclusivity was worth pursuing;

– That ESC should seek both a royalty fee and an hourly consulting fee given the scope of services ESC planned to provide;

– That most PlayStation events were not open to the general public and did not permit merchandise sales, though SIE had progressed to selling merchandise at some shows;

– That compliance with quality and safety standards was important to SIE; and

– That SIE could not produce the Pin Program internally and would need to rely on outside licensees or manufacturing partners.  *Id.* at 2–3.

On the second question — whether Ms. Gayner provided ESC with confidential or privileged SIE information — the Special Master found that certain communications by Ms. Gayner, particularly those concerning SIE's merchandise sales practices, manufacturing preferences, internal production limitations, and the MLA "appear to be based on her prior employment with SONY operations, their employees," and the MLA.  *Id.* at 5.  The Special Master's finding is qualified, however: "[I]t appears, that when Ms. Gayner advised ESC on the Pin Program terms, . . . she provided ESC with confidential or privileged SIE materials or information in some of her comments. . . . I use the term 'appears' in this finding because I do not know what is publicly known or unknown in this business about SIE PS events, attendees, selling practices, manufacturing preferences and processes."  *Id.* at 5–6.  This express qualification by the Special Master is significant, as it touches on a critical and still unresolved aspect of the dispute before this Court: whether the information provided by Ms. Gayner was in fact non-public or unascertainable to an *industry participant* like ESC and whether this was information not already known by Mr. Scarecrow.  As discussed below, this is an important factor in determining whether an issue preclusion/terminating sanction is warranted.

On the third question of material transactional advantage, the Special Master found that Mr. Scarecrow hired Ms. Gayner for her knowledge of SIE and kept her involvement secret, and inferred from those facts that Scarecrow sought a material transactional advantage.  *Id.* at 7–8.

The Special Master, however, acknowledged that "there may be several motivations for keeping the hiring of Ms. Gayner a secret from SIE." *Id.* at 8. With respect to the definition of "material transactional advantage," the Special Master explained that in this context "[a] material transactional advantage refers to a significant, quantifiable benefit that one party holds over another during a business transaction. . . . This type of advantage is considered 'material' because it is substantial enough to influence a party's decision-making or financial outcomes. It goes beyond a small or minor benefit and has a real tangible impact." *Id.* at 7 (internal quotation marks omitted). The Special Master concluded that certain pieces of advice provided by Ms. Gayner, specifically regarding SIE's "typical no exclusivity position, its manufacturers' preferences, what SIE could not produce internally, [and] trade shows merchandise practices" were grounded in Ms. Gayner's knowledge of SIE practices and conferred a material transactional advantage. *Id.* at 9. Finally, on material transactional advantage, the Special Master also found that Ms. Gayner's continuing relationship with Gerardo "Gerry" Riba, a SIE employee involved in the Pin Program, provided an advantage by offering ESC a potential channel to SIE after its relationship with Brian Miller deteriorated. *Id.* The Special Master acknowledged though, that "there is no record in the Reveal[3] database that I could find that Ms. Gayner in fact reached out to Gerry after the break in the relationship between Mr. Scarecrow and Brian [Miller]." *Id.* The Special Master was not asked by the Court to — and indeed did not — identify any specific negotiating positions taken by ESC that were either affected in fact or likely affected by the information provided by Ms. Gayner, or any particular terms of the EVA that were either shaped in fact or likely shaped by Ms. Gayner's advice in a manner advantageous to ESC.

On the fourth question, the Special Master found no presumption of transactional taint based on missing documents, concluding that there were no missing or material missing documents. *Id.* at 10.

With the parties' consent, the Court has independently evaluated the documents relied upon by the Special Master *in camera*. Because no party filed timely objections to the Special

---

[3] The "Reveal database" refers to the document review database that contained Gayner documents and was accessible only by the Special Master. *See* Order Appointing Special Master (Dkt. 435).

Master Report under Rule 72(b), the Court reviews the Special Master's factual findings for clear error. Order Appointing Special Master at 5 ("The Parties shall further have the opportunity to file written objections to the Special Master's Final Written Statement, and will proceed pursuant to the procedures set forth in Federal Rule of Civil Procedure 72(b)(2) and (3)."). The Court finds no such error. But the Special Master was not tasked with determining whether sanctions are appropriate, and the Special Master's findings accordingly do not resolve the distinct legal question of whether the factual findings establish a predicate for terminating or issue preclusion sanctions.

### E.      Order to Show Cause

Following receipt of the Special Master's report, SIE repeatedly argued in favor of sanctions that would terminate this suit or at least ESC's breach of contract claims. SIE asserts that ESC engaged in bad faith conduct before and during the litigation by coordinating with Ms. Gayner, using her purportedly privileged SIE knowledge to construct and maintain the breach of contract claims, concealing her involvement, breaching the duty of candor, and continuing to work with "tainted attorneys, including MABR and Innes Smolansky." SIE Sanctions Brief (Dkt. 472) at 5–10.

On March 30, 2026, the Court issued an Order to Show Cause. OSC (Dkt. 505). The OSC reflects the Court's own close review of the Special Master's report and the underlying documents cited therein which contain Ms. Gayner's advice to Mr. Scarecrow regarding the EVA. *Id.* The parties do not dispute the Special Master's factual findings. *See* Joint Status Report at 2 ("Plaintiff asked questions, rather than objecting to the findings, because Plaintiff's counsel does not have access to the documents the Special Master reviewed, so ESC had no basis to object to any particular finding related to any particular document."). The parties do indeed dispute, and the Court must now resolve, whether those facts and other evidence warrant the imposition of dispositive sanctions. Specifically, the Court must determine whether Ms. Gayner's advice was based on information not known or reasonably ascertainable by ESC through ordinary commercial diligence, and whether it materially affected the EVA terms.

The Court directed SIE to respond with evidence and argument explaining how each of

11

nine discrete instances of Ms. Gayner's advice identified by the Special Master: (a) constituted or was based on confidential or otherwise non-public information *not known or readily ascertainable by ESC through ordinary diligence*, and (b) materially advantaged ESC's negotiation position *with respect to the EVA*. *Id.* The nine instances of advice that the Court identified are reproduced as follows:

> 1. Ms. Gayner advised ESC that SIE rarely enters into exclusivity agreements but that it was worth requesting an exclusivity provision in negotiations with SIE.
>
> 2. Ms. Gayner advised ESC to negotiate a royalty fee and hourly fee because ESC planned to consult, design, and produce merchandise as part of the EVA.
>
> 3. Mr. Scarecrow expressed that SIE did not appear to have the ability to produce the Pin Program internally and that it works with vendors. In response, Ms. Gayner confirmed that SIE cannot produce the Pin Program internally and that SIE would need to rely on licensees or other manufacturing partners.
>
> 4. Ms. Gayner advised ESC that most PS events were not open to the public and that many PS events did not allow for the sale of merchandise, but that PS occasionally sells merchandise at its trade shows.
>
> 5. Ms. Gayner advised ESC that SIE had a mobile marketing team at some point, and that if SIE still had such a program, it could potentially sell ESC-produced merchandise from trucks.
>
> 6. Ms. Gayner advised ESC in responding to a draft pitch deck by advising ESC to emphasize its ability to design, manufacture, and distribute merchandise; ESC's existing fan base; and ESC's commitments to quality, consumer safety, and environmental compliance.
>
> 7. In response to a draft term sheet, Ms. Gayner advised ESC that:
>
>> a. A draft term of three years appeared appropriate.
>>
>> b. Based on ESC's representation that it would develop and host a website and app, ESC should request an hourly fee for development and a monthly maintenance fee.
>
> 8. Ms. Gayner advised ESC that its Pin Program pitch deck and term sheet should be considered confidential and not shared with third parties pursuant to the Merchandise Licensing Agreement, and that ESC should not share the term sheet until SIE agreed to keep the terms confidential.
>
> 9. Ms. Gayner advised ESC that: SIE was unlikely to cancel a pending order and refuse to pay for merchandise already

> manufactured by ESC based on an agreement; that SIE's Licensing Department would not have cancelled a pending order and reused payment during Ms. Gayner's tenure at SIE; and that if SIE in fact refused to pay, ESC could sue for breach of contract.

OSC at 2–3.

Before addressing the merits, the Court again clarifies the two analytically distinct categories of misconduct alleged. The first, which the Court calls "litigation taint," refers to Ms. Gayner's improper collaboration with MABR in connection with this active litigation — her role in drafting the 2020 Gayner Declaration and her participation in litigation strategy sessions or other involvement adverse to her former client SIE during the pendency of this case. That conduct has already been adjudicated, and its consequences, including MABR's disqualification and entry of the Protective Order, have been settled. Disqualification Order (Dkt. 335); Protective Order (Dkt. 369). The second category is labeled "transactional taint," and it refers to Ms. Gayner's advice to ESC during the EVA negotiations with SIE before this litigation commenced. The OSC was exclusively focused on transactional taint. Given the nature of the termination/preclusion sanctions at issue, the standard for finding transactional taint sufficient to warrant such a sanction is a demanding one, more exacting than that found for litigation taint resulting in disqualification of counsel.

SIE filed a lengthy brief responding to the OSC, organized principally around several structural arguments before proceeding to the merits of the nine specifically-identified instances of advice. SIE Response to OSC (Dkt. 511-1). *First*, SIE argues that Sony's licensing practices are company-specific and not readily ascertainable through ordinary diligence, because companies structure licensing relationships differently, and knowledge of how SIE approaches exclusivity, royalties and fees, production capacity, and vendor preferences is inherently proprietary information. *Id.* at 1–4. *Second*, SIE argues that Mr. Scarecrow himself acknowledged that his understandings of SIE's practices came from his direct dealings with SIE rather than generic industry knowledge, and that this concession means that his knowledge was necessarily derived from Ms. Gayner because she formulated SIE's licensing framework. *Id.* at 3–5. *Third*, SIE argues that Ms. Gayner's own declaration confirms that her knowledge was derived from her SIE employment rather than general industry experience. *Id.* at 8 ("This testimony establishes that

knowledge of Sony's licensing practices — including its deal structures, internal categorizations, and negotiation approaches — are inherently company-specific and derived from internal operations, and are not publicly available or readily ascertainable through ordinary diligence because it was unique to Ms. Gayner."). **Fourth**, SIE argues that the Special Master's findings directly contradict Scarecrow's narrative that all information was "industry standard," and instead establish improper use of SIE's confidential and non-public information. *Id.* at 9–11. **Fifth**, SIE argues that Mr. Scarecrow understood that SIE treated contractual terms as confidential, due to the express terms of the MLA and the 2009 NDA between Mr. Scarecrow and SIE. *Id.* at 11–13. **Sixth**, SIE argues that ESC's own malpractice pleadings in which ESC characterized the Gayner information as "confidential, proprietary, and attorney-client privileged," establish the confidential nature of the information provided for purposes of this proceeding. *Id.* at 13–14. **Seventh**, SIE argues that the categories of information at issue are precisely the type of information courts routinely protect as confidential business information. *Id.* at 14–15.

SIE only then proceeds to address each of the nine instances of Ms. Gayner's advice, arguing in each case that the advice was based on non-public information and that it conferred a material transactional advantage. *Id.* at 15–28. The rationales for these conclusions are largely formulaic and repetitive, without any concrete evidence of non-ascertainability or materiality. SIE then concludes by describing the inconsistent contents of Mr. Scarecrow's five declarations submitted to the Court between 2020 and 2026, arguing that the pattern of shifting accounts reflects a continuously changing narrative untethered to the contemporaneous record that itself warrants terminating sanctions. *Id.* at 25–28.

SIE's brief problematically does not cleanly distinguish between conduct constituting litigation taint and transactional taint, frequently treating evidence of Ms. Gayner's litigation involvement as evidence of transactional misconduct warranting dispositive sanctions. *See* SIE Sanctions Brief (Dkt. 472). But the Court treats these categories of misconduct as distinct. The question before the Court is whether any evidence of *transactional taint* exists and warrants the far more severe remedy of terminating or issue preclusion sanctions against ESC's substantive claims. *See* OSC.

United States District Court
Northern District of California

ESC's response to the OSC is structured around the argument that SIE fundamentally misunderstands the inquiry that the OSC posed. ESC Response to OSC (Dkt. 514-1). ESC correctly argues that the relevant question is ***not merely whether information was confidential*** in general or whether it fell within an NDA's definition of confidential information, but whether it was already ***known or readily ascertainable by ESC*** — *i.e.*, a party with nearly ten years of direct commercial experience with SIE including the negotiation of similar deals for the manufacture of video game merchandise. *Id.* at 5–6. It is this inquiry that goes beyond what the Special Master determined. As to each of the nine instances of advice provided by Ms. Gayner, ESC contends that the information was either publicly observable, independently known by ESC because of its own business history with SIE (without the assistance of Ms. Gayner), or so generic as to constitute basic advice any competent transactional lawyer would give regardless of prior employment with SIE. *Id.* at 8–20. ESC further argues that SIE failed to provide any evidence of how the advice actually changed ESC's negotiating position or the terms of the EVA. *Id.* ESC also repeats its request for disclosure of any settlement or indemnification agreement between SIE and Ms. Gayner, arguing that it bears on Ms. Gayner's credibility and potential bias. *Id.* at 23–24.

### III.    DISCUSSION

#### A.    Sanctions and Order to Show Cause

As a threshold matter, the Court's Order Appointing Special Master directed parties to file any objections to the draft Special Master Report within five business days and that "[a]fter the time period for comments and questions has passed, or after the Special Master has resolved the comments and questions (whichever is later), the Special Master shall file the Final Written Statement with the Court." Order Appointing Special Master (Dkt. 435) at 4. After the Final Written Statement was filed, the Court provided the parties further opportunity "to file written objections to the Special Master's Final Written Statement . . . pursuant to the procedures set forth in Federal Rule of Civil Procedure 72(b)(2) and (3)." *Id.* at 5. ESC filed questions directed at the Special Master, but ESC did not timely object to the Special Master Report and it concedes that it has "no basis to object to any particular finding" in the Special Master's Report. ESC Status Report (Dkt. 486) at 2. Finding no error, clear or otherwise, in the Special Master's findings, the

Court hereby **ADOPTS** the Special Master's Report and its findings.

The Court's adoption of the Special Master Report does not, however, resolve the issue of preclusion sanctions. As noted above, the Special Master was not asked to make a determination with respect to sanctions, nor did the Special Master's analysis directly address the standard for sanctions articulated in the OSC: namely, whether specific instances of Ms. Gayner's advice were based on information not known or reasonably ascertainable by ESC through ordinary commercial diligence (independent of Ms. Gayner's advice), and whether that advice in fact materially affected the terms of the negotiated agreement in ESC's favor. Those questions remain for the Court to determine in deciding whether to issue a preclusion sanction.

### 1.    <u>Legal Standard for Dispositive Sanctions Based on Transactional Taint</u>

SIE seeks issue preclusion or terminating sanctions, arguing that Ms. Gayner was improperly involved in the EVA negotiation process and the transactional taint "underlies each of ESC's breach of contract claims." SIE Sanctions Brief (Dkt. 472-1) at 10. Terminating sanctions are available only in "extreme circumstances, where the violation is due to willfulness, bad faith, or fault of the party." *Yu v. ByteDance Inc.*, 759 F. Supp. 3d 992, 999 (N.D. Cal. 2024) (quoting *In re Exxon Valdez*, 102 F.3d 429, 432 (9th Cir. 1996)). Issue preclusion sanctions that strike entire claims demand an equivalent showing. *See, e.g.*, *R&R Sails, Inc. v. Insurance Co. of Penn.*, 673 F.3d 1240, 1247 (9th Cir. 2012) ("Under this circuit's law, because the sanction amounted to dismissal of a claim, the district court was required to consider whether the claimed noncompliance involved willfulness, fault, or bad faith, and also to consider the availability of lesser sanctions.") (citations omitted); *Perry v. Brown*, 2019 WL 6888048, at *3 (C.D. Cal. June 11, 2019) (same); *Ajaxo Inc. v. Bank of Am. Tech. and Operations, Inc.*, 2008 WL 5101451, at *2 (E.D. Cal. Dec. 2, 2008) ("Preclusion or terminating sanctions are authorized only in 'extreme circumstances' of violations 'due to willfulness, bad faith, or fault of that party.'") (quoting *U.S. v. Kahaluu Const.*, 857 F.2d 600, 603 (9th Cir. 1988)).

The Court's OSC identified a two-prong inquiry for evaluating whether Ms. Gayner's transactional advice warrants the dispositive sanctions that SIE seeks. OSC. Under the framework, SIE must demonstrate for each instance of advice provided by Ms. Gayner: (1) that

United States District Court
Northern District of California

the advice was based on information that was non-public and not already known or readily ascertainable by ESC through ordinary diligence; and (2) that the advice in fact materially advantaged ESC's negotiating position with respect to the EVA, in the sense that it affected the terms of the negotiated agreement in a way that can be traced to Ms. Gayner's advice rather than ESC's independent knowledge and business judgment.

Both prongs must be satisfied for the Court to consider terminating or issue preclusion sanctions. If the information underlying a given piece of advice was known to ESC or readily ascertainable through ordinary commercial diligence, particularly in light of ESC's nearly decade-long business relationship with SIE, then the advice by Ms. Gayner had no real causal effect on the transaction negotiated by ESC and SIE. Moreover, there must be a basis to conclude that the advice actually affected concrete terms of the EVA or specific negotiating positions taken by ESC. Again, absent such a showing, there is no causal relationship between Ms. Gayner's advice and the subject transaction sufficient to warrant terminating/preclusion sanctions. To invoke such sanctions, the counter-party must have been prejudiced. *See, e.g.*, *Domingo v. Donahoe*, 2013 WL 12173925, at *3 (N.D. Cal. Mar. 27, 2013) ("Finally, sanctions for spoliation are unavailable where there is no showing of prejudice."); *Marin v. Eidgahy*, 2012 WL 928250, at *11 (S.D. Cal. Mar. 19, 2012) (declining to strike opposition brief as a sanction "in the absence of culpable conduct or identifiable prejudice to Plaintiff"); *Jackson v. Cap. Mgmt. Servs., LP*, 2014 WL 12597808, at *5 (C.D. Cal. July 21, 2014) (denying motion for sanctions in part because "there is no prejudice" to plaintiff); *U.S. v. Dunlavy*, 2021 WL 4318299, at *5 (E.D. Cal. 2021) (declining to strike testimony as a sanction where body camera footage was destroyed but audio remained audible and officer was subject to cross-examination, because "[t]he Court possesses the discretion to forego sanctions *where a defendant is not prejudiced*") (emphasis added); *see also Anheuser-Busch*, 69 F.3d at 348 (listing "prejudice to the party seeking sanctions" as a factor to consider when imposing dispositive sanctions); *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1329 (Fed. Cir. 2011) ("Moreover, the presence of bad faith and prejudice, without more, do not justify the imposition of dispositive sanctions."). Because dispositive sanctions are among the most severe remedies available to the Court, any prerequisite showing must be correspondingly

17

substantial.

SIE, as the party seeking sanctions, bears the burden of establishing the existence of transactional taint warranting the imposition of terminating or issue preclusion sanctions. SIE argues that because ESC failed to file timely objections to the Special Master's findings, a clear error standard of review applies, that under such a standard the burden shifts to ESC to demonstrate that the findings are "clearly erroneous," and that the OSC's framework improperly required SIE to prove a negative (*i.e.*, that information was "not known or readily ascertainable" by ESC). SIE Supplemental Brief (Dkt. 522-1) at 2–7. The proposition that the party seeking sanctions must bear the burden of establishing the predicate for that relief is not in genuine dispute and is squarely supported by binding authority. *See Ryan v. Editions Ltd. West, Inc.*, 786 F.3d 754, 766 (9th Cir. 2015) (stating that movant "had the burden of establishing spoliation" before the court "had discretion to impose sanctions pursuant to its inherent power"); *Katzman v. L.A. Cnty. Metro. Transp. Auth.*, 2015 WL 13861765, at *14 (N.D. Cal. Mar. 26, 2015) (Koh, J.) ("The moving party has the 'heavy burden to establish the appropriateness of terminating sanctions.'") (quoting *Stanley Black & Decker, Inc. v. D&L Elite Invs., LLC*, 2014 WL 3738327, at *10 (N.D. Cal. June 20, 2014)).

ESC indeed failed to file timely objections, and the Special Master's factual findings are therefore reviewed for clear error. *See* Order Appointing Special Master at 5. But the Special Master's findings do not resolve the sanctions question, because the Special Master was not asked to determine whether sanctions are warranted, and she was not asked to make every finding necessary for such sanctions. *Id.* Instead, the Court reviews the Special Master's Report and additional evidence in the record to determine whether SIE has met its burden of establishing a basis for dispositive sanctions. Finally, the Court also notes that even if SIE were to satisfy the two-prong OSC framework, SIE would still need to demonstrate that dispositive sanctions are appropriate under the Ninth Circuit's five-factor test which weighs the public interest in expeditious resolution, the Court's docket management interests, the risk of prejudice to the moving party, the public policy favoring resolution on the merits, and the availability of lesser sanctions. *Anheuser-Busch, Inc. v. Nat. Beverage Distributors*, 69 F.3d 337, 348 (9th Cir. 1995)

(requiring courts to weigh five factors before imposing "the harsh sanction of dismissal"); *Metricolor LLC v. L'Oréal USA, Inc.*, 2025 WL 3281522, at *1 (9th Cir. Nov. 25, 2025) (applying five-factor *Anheuser-Busch* test to determine appropriateness of terminating sanctions). The Court is doubtful that the test would be satisfied in any event. Because SIE does not even clear the threshold showing on the OSC's two prongs, however, the Court does not reach the five-factor analysis.

### 2.    The Pin Program and Terms of the Alleged EVA

The two-prong inquiry, and particularly the materiality analysis, requires a clear understanding of the specific terms of the EVA that ESC contends were negotiated. According to the Complaint, the EVA was an oral agreement entered into by the parties on October 2, 2017. Complaint ¶ 74. Under that EVA, "ESC would conceptualize, design, manufacture, and supply pins to be included in pre-sale promotional PlayStation items or events." *Id.* In exchange, ESC agreed not to present a competing pin collection or trading program to SIE's potential competitors. *Id.*

The documentary record provides additional details regarding commercial terms ESC sought to include in the EVA. The Court's review of term sheet drafts exchanged between Mr. Scarecrow and Ms. Gayner during the negotiating period reflects a proposed commercial arrangement with the following terms: exclusivity with ESC as the sole pin vendor, a royalty fee of either "WSP + 8%" or "WSP + 12%" payable to ESC on pins and cards sold at events or through retailers, third-party publishers, or the PlayStation Gear Store, and an hourly fee owed to ESC for app development. SGT_0000092; SGT_0000141.

### 3.    Evaluation of Ms. Gayner's Advice

Before addressing each instance of advice provided by Ms. Gayner, the Court notes that, by the time Ms. Gayner became involved with ESC in 2017, ESC was a sophisticated industry player independently familiar with video game licensing practices. ESC had been doing business directly with SIE since 2009, first under a consulting agreement and later under multiple MLAs, with the licensing portfolio between the two companies expanding over time to encompass sixteen SIE titles. Scarecrow Declaration (Dkt. 497) ¶¶ 15–22, 42–44, 55. In that time, Mr. Scarecrow, as

19

United States District Court
Northern District of California

part of ESC, negotiated and performed under a non-disclosure agreement, a consulting agreement, a 2009 statement of work, a 2011 MLA, and 2011 statement of work, and a 2014 MLA — each involving direct interaction with SIE personnel. *Id.* Separate from SIE, ESC had engaged in licensing agreements with 505 Games, Klei Entertainment, Devolver Digital, CMON, and Activision Blizzard, all predating Ms. Gayner's engagement with ESC. *Id.* ¶¶ 8–14, 52–53. Those arrangements included exclusivity provisions, royalty structures, consulting fees, confidentiality provisions, and indemnification agreements. *Id.*; Exs. A, C, D. This commercial history is relevant to the Court's inquiry into whether sanctions are warranted, as it informs the likelihood that SIE was actually prejudiced in negotiating the terms of the EVA as a result of Ms. Gayner's advice. Keeping this baseline in mind, the Court now addresses each of the nine identified instances of Ms. Gayner's advice.

### a.    Instance #1: Exclusivity Advice

Ms. Gayner advised Mr. Scarecrow via email that SIE rarely enters into exclusive agreements but that it was worth requesting an exclusivity provision in negotiations with SIE. OSC at 2.

SIE argues that knowledge of SIE's general reluctance to grant exclusivity "reflects internal contracting practices and strategic preferences that are not publicly disclosed." SIE Response to OSC at 16. This argument misunderstands the point of the Court's inquiry: it is not compelling that information was not "publicly disclosed." Rather, SIE was tasked with explaining why someone like Mr. Scarecrow would not already know that SIE is reluctant to enter into exclusive arrangements with licensees.

The Special Master Report is not dispositive on this question. The Special Master indicated that Ms. Gayner's advice about exclusivity falls into the categories of information that "appear to be based on [Ms. Gayner's] prior employment with SONY." Special Master Report at 5. As discussed above, the Special Master intentionally used the word "appear" because she did not know what was publicly known in the industry or what ESC already knew. *Id.* at 5–6.

With respect to whether ESC knew or could reasonably ascertain that SIE disfavors exclusive arrangements, SIE's position is not convincing on this record. Mr. Scarecrow had

extensive, firsthand experience negotiating licensing agreements with SIE. *See* Complaint ¶ 44. By the time Mr. Scarecrow retained Ms. Gayner in 2017, he had negotiated and operated under a consulting agreement, two statements of work, and two MLAs. Scarecrow Declaration ¶¶ 15–22. None of these agreements with SIE were exclusive. *See id.* Placed in context, Scarecrow had also developed and executed pin programs pursuant to licensing agreements with similar companies including 505 Games, Klei Entertainment, Devolver Digital, CMON, and Activision Blizzard. *Id.* ¶¶ 8–14. In contrast to the prior SIE deals, Mr. Scarecrow attests that prior deals with these video game companies included "standard elements in any licensing or merchandising agreement," *including* exclusivity provisions with 505 Games, Klei Entertainment, and Devolver Digital. Scarecrow Declaration ¶¶ 52–53, 67; *see also id.*, Exs. A, D.

A party that has negotiated and performed under multiple non-exclusive agreements with the same counterparty for nearly a decade is in a position to reasonably infer, without the need for insider assistance, that this counterparty disfavors exclusivity. That inference requires no special knowledge. SIE itself argues that Scarecrow's knowledge of SIE's practices derived from his direct dealings with SIE, which further supports the conclusion that ESC could ascertain this information through ordinary diligence. SIE Response to OSC at 1–5.

On the second prong, materiality, knowledge that SIE disfavors exclusivity does not clearly provide ESC with a material advantage by affecting the terms of the EVA in ESC's favor. SIE merely argues that the advice allowed ESC to "precisely calibrate its demands . . . and to structure its proposals in a way designed to extract concessions or favorable trade-offs." SIE Response to OSC at 16. But SIE presents no evidence enabling the Court to infer that negotiations or the EVA were in any way meaningfully affected in a manner benefitting ESC as a result of Scarecrow knowing SIE disfavored exclusivity.

#### b.    Instance #2: Royalty and Hourly Fee Advice

Ms. Gayner advised ESC to negotiate a royalty and hourly fee compensation framework because ESC planned to consult, design, and produce merchandise as part of the EVA. OSC at 2. In response to this advice, Mr. Scarecrow explained that he had not thought to ask for such a fee arrangement with SIE. This latter statement in response to Ms. Gayner's advice is the most

21

significant evidence that Ms. Gayner's advice may have introduced a concept that Mr. Scarecrow did not independently consider or develop.

The Special Master included this instance of advice among the "terms of the Pin Program" that "reflect the recommendations suggested by Ms. Gayner." Special Master Report at 2. The Special Master did not refer to the royalty advice otherwise. *See id.*

The Court has independently reviewed the documentary record. On careful review, the Court concludes that this instance does not satisfy the first prong of the Court's OSC. The advice to seek a hybrid payment scheme — a royalty for product sales and an hourly fee for consulting and design services — requires no knowledge specific to SIE. And Ms. Gayner did not advise, for example, that SIE accepts such arrangements or a particular fee structure, that it has historically paid particular rates, that its Licensing Department has a preference for one form of compensation over another, or any other information that would be specific to SIE. Her advice was simply something that any competent transactional attorney, engaged by a client planning to perform similar services for any counterparty, could offer. There is no evidence that this advice from Gayner reflected publicly unknown insider information rather than general knowledge of a transaction attorney.

Furthermore, while Mr. Scarecrow wrote that he had not thought to ask for a hybrid fee structure, the record makes clear that he was familiar with both royalty and fee structures from his own prior work. ESC had royalty provisions or other fee arrangements in numerous prior agreements, including with 505 Games, Klei Entertainment, and other licensors. Scarecrow Declaration ¶¶ 52–53, Exs. A, B, C, E. ESC also had a 2009 consulting agreement with SIE itself that provided for separate compensation for consulting work. *Id.*, Ex. G. Given his demonstrated familiarity with different compensation arrangements across multiple prior agreements, Mr. Scarecrow would not have required access to proprietary SIE information to conceive of a hybrid fee structure suited to an engagement like the EVA, which itself contemplated distinct categories of work warranting different forms of payment. In any event, the prevalence of such fee structures as experienced by Mr. Scarecrow underscores the likelihood that advice given by Ms. Gayner on this subject was based on general knowledge, not insider SIE information.

22

Accordingly, the advice regarding fee structures reflected standard transactional advice rather than non-public, SIE-specific intelligence.  Because this advice has not been shown by SIE to have been based on SIE-specific proprietary information, terminating/preclusion sanctions cannot be based on this information.

### c.     Instance #3: Production Capability and Vendors

Mr. Scarecrow stated he understood that SIE did not have the ability to produce the Pin Program internally and that SIE relies on outside vendors.  In response, Ms. Gayner confirmed that SIE cannot produce the Pin Program internally and that SIE would rely on licensees or other manufacturing partners.  OSC at 2.

The Special Master cited SIE's manufacturing preferences and internal production limitations as among the items she found to "appear to be based on [Ms. Gayner's] prior employment with SONY."  Special Master Report at 5.  ESC submitted a question to the Special Master asking whether the Special Master had "knowledge of what ESC knew about . . . 'what SIE could not produce internally' . . . before any such information was supposedly shared by Ms. Gayner."  Questions Submitted in Response to Special Master Report (Dkt. 479-4) at 7.  The Special Master responded: "No." *Id.*  The Special Master's finding with respect to this instance of advice is therefore quite limited.

The OSC's framing of this exchange is significant: Mr. Scarecrow "expressed" an observation and Ms. Gayner "confirmed it."  OSC at 2.  The sequencing matters.  By the time Ms. Gayner provided a response, Mr. Scarecrow had already formed and articulated a belief that SIE lacked internal production capability and relied on vendors.  Thus, the exchange between Mr. Scarecrow and Ms. Gayner is merely confirmational, not informational.  And the belief that Mr. Scarecrow expressed is not proprietary information — the commercial basis for ESC's relationship with SIE since 2009 indicated that SIE needed outside vendors to design and manufacture merchandise.  ESC had been and was one such vendor.  Scarecrow Declaration ¶¶ 15–22.

SIE responds that internal production limitations are "not publicly disclosed" and that they constitute "operational details" reflecting non-public knowledge.  SIE Response to OSC at 17–18.

23

But the question is not whether the information was disclosed to the general public. The question at issue is whether the information was known to ESC over the course of its decade-long relationship with SIE. The Court finds that ESC knew this. There is no evidence to the contrary.

Furthermore, with respect to material advantage, SIE argues that Ms. Gayner's confirmation of Mr. Scarecrow's inference gave ESC confidence in negotiating the EVA. SIE Response to OSC at 18. Confidence derived from confirmation of a belief already held does not necessarily result in a material transactional advantage. The advice did not reveal, for example, SIE's negotiating position, points of leverage, or internal decisionmaking criteria. SIE identifies no specific EVA term or negotiating position that was likely shaped by this exchange.

Accordingly, this instance of advice satisfies neither prong of the OSC standard for sanctions.

### d.    Instances #4 and #5: Event Access, Merchandise Sales, and Mobile Marketing Team

Ms. Gayner advised ESC that most PlayStation events were not open to the public and that many PlayStation events did not allow for the sale of merchandise, but that SIE occasionally sells merchandise at its trade shows. OSC at 2. Separately, she advised that SIE had a mobile marketing team at some point, and that if SIE still had such a program, it could potentially sell ESC-produced merchandise from trucks. *Id.*

The Special Master found that Ms. Gayner "advised Mr. Scarecrow that most PS events were not open to the public and many did not allow for the selling of merchandise, and that she knew that PS had progressed to selling merchandise at some of their shows." Special Master Report at 3. The Special Master included SIE's "trade shows merchandise practices" among the categories of advice that "resulted in a material transactional advantage." *Id.* at 8–9. But again, the Special Master expressly acknowledged that she used the word "appear" to limit her finding "because I do not know what is publicly known or unknown in this business about SIE PS events, attendees, selling practices, manufacturing preferences and processes." *Id.* at 6. Similarly, the Special Master identified "SIE PS events" as a topic on which she could not assess what Mr. Scarecrow already knew. *Id.*

The Special Master's acknowledgement is particularly significant for these two instances of advice. Whether PlayStation holds events open to the public, whether merchandise is sold at events, and SIE's general consumer marketing activities are matters observable by attendees, vendors, or industry participants who follow video game events and marketing. The record does not suggest that event access or merchandise sales practices at SIE events were withheld from vendors or treated as intelligence to be kept confidential from vendors or manufacturers. In fact, Mr. Scarecrow attended such events and was introduced to Ms. Gayner in 2009 at San Diego Comic-Con. Scarecrow Declaration ¶ 30; *see also* Ex. J (indicating that ESC had a booth at New York Comic-Con). In an email to Ms. Gayner, Mr. Scarecrow represents that SIE told him "that they're going to appear at more pop culture trade show events in the future ie [San Diego Comic-Con], [New York Comic-Con], etc." SGT_0000137.

ESC represents that Mr. Scarecrow was "fully aware of how PS events operated" because he attended many of them and was invited to others. ESC Reply to OSC at 13. In fact, event sales were always conceived as an aspect of the Pin Program. Mr. Scarecrow represents that a core feature of the Pin Program was "Event-Driven Exclusivity: Specially made pins available only at specific Sony and PlayStation events would create demand and have fans 'eagerly waiting for the next event.'" Scarecrow Declaration ¶ 79. ESC's own pitch deck, prepared and transmitted to SIE before any involvement by Ms. Gayner, describes pins as "only available for specific Sony and PlayStation events" and pitches "[e]vent exclusive pins" as a feature of the Pin Program concept. SGT_0000008. These characterizations reflect firsthand familiarity with PlayStation's event structure.

Ms. Gayner's advice on mobile marketing teams presents an even weaker basis for sanctions. Ms. Gayner's language was expressly conditional, acknowledging that she had departed SIE three years earlier and did not know whether the mobile marketing team still existed. The Special Master did not specifically address the mobile marketing team as a separate finding and did not assess whether it remained operational or whether information about it would be considered proprietary. The Court finds that the advice about the mobile marketing team was uncertain, possibly stale, and insufficient to satisfy the standard for non-public, non-ascertainable

United States District Court
Northern District of California

information. In short, the record does not support that Ms. Gayner provided insider SIE information that was now already known to or was not readily ascertainable by Mr. Scarecrow without Ms. Gayner's advice.

With respect to material advantage, SIE argues that the advice allowed ESC to "tailor its proposal" to make its pitch more attractive. SIE Response to OSC at 19. But SIE offers no description of any specific negotiation position or EVA term that was likely shaped by such advice.

### e.    Instance #6: Pitch Deck Advice

Ms. Gayner advised ESC, in response to a draft pitch deck, to emphasize ESC's ability to design, manufacture, and distribute merchandise; ESC's existing fan base; and ESC's commitments to quality, consumer safety, and environmental compliance. OSC at 2–3.

In reference to this advice, the Special Master found that Ms. Gayner advised Mr. Scarecrow "that his having the manufacturing partners in place, and already vetted for quality and safety is a big deal because PS wouldn't want to work with certain manufacturers due to quality issues." Special Master Report at 3. The Special Master Report does not otherwise comment on whether this advice drew on SIE's proprietary information. It only generally refers to "manufacturing preferences" as constituting information that "appear[s] to be based on [Ms. Gayner's] prior employment with SONY." *Id.* at 5. Again, this is a qualified finding that, as discussed above, the Special Master expressly cabined by acknowledging that she did not know what was publicly known in the industry or what ESC already knew. *Id.* at 5–6.

The Court's review of the underlying documents confirms that none of Ms. Gayner's suggested talking points disclose anything proprietary about SIE — for example, its internal requirements for licensees, manufacturers, or vendors, or any concrete decisionmaking criteria. The advice consists entirely of recommendations about how ESC should present its own capabilities to a potential licensor in order to be compelling. But the fact that SIE would value a vendor's demonstrated ability to design, manufacture, and distribute merchandise; its established market presence among relevant consumers; and its compliance with quality and safety standards all reflect basic commercial common sense likely to have been known or ascertainable to a

26

United States District Court
Northern District of California

sophisticated industry players like ESC.  The observation that SIE would not want to work with manufacturers who use the wrong kind of paint, for example, is a general consumer product safety consideration that requires no SIE-specific knowledge, much less proprietary SIE-specific knowledge.  SIE does not point to any internal policy, standard, or undisclosed preference that this rather generic advice allegedly revealed.  SIE Response to OSC at 20–21.

With respect to materiality, SIE merely argues that the advice allowed ESC to present a more compelling partnership.  *Id.*  Improving the quality of a presentation is not equivalent to obtaining asymmetric intelligence about a counterparty's undisclosed decisionmaking criteria, preferences, or thresholds and boundaries.  SIE identifies no specific EVA term or negotiating position that was shaped by this advice, beyond a general improvement in ESC's pitch, something for which ESC already had an obvious incentive.  This is insufficient to support a finding of materiality necessary for terminating/preclusion sanctions.

### f.        Instance #7: Term Sheet Advice

In response to a draft term sheet, Ms. Gayner advised ESC that a three-year initial term appeared appropriate, and that based on ESC's representation that it would develop and host a website and app, ESC should request an hourly fee for development and a monthly maintenance fee.  OSC at 3.

The Special Master did not conclude that either piece of term sheet advice drew on SIE-specific knowledge, and neither the three-year term nor the website and app fee advice is enumerated in the Report among the categories found to "appear to be based on [Ms. Gayner's] prior employment with SONY."  *See* Special Master Report at 5–6.  SIE argues that Ms. Gayner's approval of a three-year term "reflects her knowledge of SIE's typical deal durations, internal approval thresholds, and contracting norms developed through her prior role."  SIE Response to OSC at 21.  But this is purely SIE's characterization, not a Special Master finding.  SIE presented no specific evidence in response to the Court's OSC supporting this assertion.  There is no evidence that this advice reflects Ms. Gayner's knowledge that was particular to SIE.

In any event, with respect to the asserted proprietary nature of this information, it appears that Ms. Gayner merely reviewed a draft term sheet that ESC had already prepared;  it appears that

ESC had independently assessed that the three-year term appeared appropriate.  The documentary record indicates that Mr. Scarecrow sent Ms. Gayner a draft term sheet with a three-year term already inserted.  SGT_0000092.  In response, Ms. Gayner left a comment affirming the three-year term based on the fact that ESC would be building a website and app.  *Id.*  Her email response to Mr. Scarecrow indicates that none of her comments are SIE-specific, and that Mr. Scarecrow was "free to edit" it as he wished.  SGT_0000094.  This is a confirmation of ESC's independently-proposed term and it reveals nothing proprietary about SIE's preferred contract duration, standard term structures, or internal approval requirements.  The hourly and monthly fee advice follows the same logic as Instance #2 — Ms. Gayner did not advise that SIE accepts such arrangements or a particular fee structure, that it has historically paid particular rates, that its Licensing Department has a preference for one form of compensation over another, or any other information that would be specific to SIE.  Her advice was simply that which any competent transactional attorney, engaged by a client planning to perform similar services for any counterparty, would offer.

Critically, Ms. Gayner did not propose any such SIE-specific information.  She merely advised that ESC should address compensation for services it would provide under the term sheet, leaving specific figures for negotiation.  In fact, Ms. Gayner never proposed a specific dollar figure or hourly rate for development, and the term sheets only reflect that ESC would be reimbursed "at an hourly rate and hosting will be compensated at a monthly hosting/maintenance fee" without any definite amount.  The absence of any specific figures further indicates that Ms. Gayner's advice drew on general transactional knowledge rather than insider information about SIE's financial practices.  This is not the kind of SIE-specific intelligence that would satisfy the first prong of the OSC inquiry.

With respect to materiality, SIE's suggestion that the advice enabled ESC to propose terms "aligned with SIE's internal norms and expectations" is unsupported by any evidence.  SIE Response to OSC at 21–22.  This is insufficient to warrant a finding of materiality.

Accordingly, this instance of advice does not satisfy either prong of the standard set out in the Court's OSC.

### g.    Instance #8: Confidentiality Advice

Ms. Gayner advised ESC that its Pin Program pitch deck and term sheet should be considered confidential and not shared with third parties pursuant to the MLA, and that ESC should not share the term sheet until SIE agreed to keep the terms confidential. OSC at 3.

At the hearing on the OSC, SIE emphasized this instance of advice, contending that Ms. Gayner coached Mr. Scarecrow to emphasize confidentiality not as a routine transactional matter, but as a means of manufacturing litigation leverage. In essence, SIE contends that this advice laid the groundwork for a breach of contract claim premised on SIE's alleged failure to maintain the confidentiality of ESC's Pin Program materials. However, the argument is not supported by the documentary record.

The Special Master did not identify this advice as drawing on SIE-specific confidential information, and it does not appear among the categories she found to "appear to be based on [Ms. Gayner's] prior employment with SONY." Special Master Report at 5–6. Nor did the Special Master include this category of advice among the instances of advice that she found to result in a material transactional advantage. *See id.* at 8–9.

With respect to the first prong of the OSC inquiry, the advice to treat an unconsummated business proposal as confidential and to secure confidentiality protections before sharing sensitive commercial terms is basic transactional guidance. It requires no knowledge of SIE's internal practices, negotiating preferences, or approach to confidentiality at early stages of a commercial relationship. Moreover, the existing agreements between ESC and SIE included mutual confidentiality provisions and an NDA. *See* Scarecrow Declaration. The concept of protecting business communications was therefore already existent and operational between the parties.

SIE's theory of litigation leverage also falls short. Most importantly, SIE presents no evidence whatsoever of this alleged intent to use confidentiality as a basis for ESC's litigation against SIE. And whether or not the advice was strategically motivated, the relevant question is whether the advice was based on non-public, SIE-specific information rather than a general litigation strategy. There is no indication that the advice to keep the terms of a pending deal confidential was based on any SIE-specific information rather than general commercial prudence.

With respect to materiality, even accepting SIE's characterization of the advice as a tactic

to achieve litigation leverage, an assertion that is speculative, SIE fails to advance any evidence indicating an asymmetric advantage in negotiations or an impact on EVA terms as a result of the advice.

Accordingly, this instance of advice satisfies neither prong of the OSC standard.

### h.       Instance #9: Payment and Breach of Contract Advice

Ms. Gayner advised ESC that SIE was unlikely to cancel a pending order and refuse to pay for merchandise already manufactured by ESC pursuant to an agreement; that SIE's Licensing Department would not have canceled a pending order and refused payment during her tenure; and that if SIE in fact refused to pay, ESC could sue for breach of contract.  OSC at 3.

At the hearing on the OSC, SIE advanced a more specific argument with respect to this instance of advice, appearing to contend that Ms. Gayner coached Mr. Scarecrow to manufacture product samples and to invest in production more generally, so that SIE would be obligated to pay for goods already made and unable to back out of a deal, effectively coercing SIE into accepting the EVA.  SIE referred to paragraphs 73, 75, and 78 of the Complaint in support of this theory. However, this argument is not supported by the documentary record.

The underlying communication on which this instance of advice is based is an October 2017 email chain in which Mr. Scarecrow reached out to Ms. Gayner regarding SIE's apparent failure to abide by the terms of an apparently different, pre-existing agreement.  Scarecrow's email refers specifically to goods in production now under a revised license agreement, and described what he characterized as a present agreement under which he already had over $750,000 of product in development.  *See* SGT_0000256.  The email does not concern EVA negotiations on the transaction in question, but rather an existing order seemingly under a separate licensing arrangement for which Scarecrow was experiencing difficulty in obtaining responses from SIE.  In that context, Ms. Gayner responded that, if ESC had in fact manufactured the products after approval of the deal, then ESC's recourse would be to sue for breach of contract.  *Id.*

Read in its full context, this is not advice about how to engineer leverage over SIE in the EVA negotiations at issue.  It is a response to a client asking what his legal options are if a counterparty refuses to honor an existing, approved order for goods apparently in respect to a

30

different deal.  SIE's effort to connect this to the EVA is not supported by the record.

The Special Master's own characterization of this category of advice is instructive.  In concluding that "when Ms. Gayner advised ESC on the Pin Program terms, . . . she provided ESC with confidential or privileged SIE materials or information," she made an explicit disclaimer that [i]n answering this question, I do not include advisory communications from Ms. Gayner to Mr. Scarecrow that read like common legal advice.  For example, on an unrelated inventory issue between Mr. Scarecrow and SONY, Ms. Gayner provided generic breach of contract legal advice."  Special Master Report at 5.  Advice about breach of contract legal remedies falls squarely within the category of generic legal advice that the Special Master declined to characterize as SIE-specific.  And Ms. Gayner's additional observation, that she could not imagine SIE canceling a paid order and that the Licensing Department would not have done so during her tenure, adds nothing of operational significance, as it is a hedged and stale statement that does not describe a specific, current policy or decisionmaking criterion.

With respect to materiality, the advice does not connect to any term of the EVA.  The order that Mr. Scarecrow described in the email was pursuant to a separate agreement, and SIE does not identify any EVA term or negotiating position that was likely shaped by this exchange.  Nor does the record support any such inference.

Accordingly, this instance of advice satisfies neither prong of the OSC standard.

### 4.    Sanctions Are Not Warranted on This Record

Having reviewed each of the nine identified instances of Ms. Gayner's advice with reference to the two-prong OSC framework, and having independently reviewed the underlying documents *in camera*, the Court concludes that SIE has not carried its burden with respect to any of the instances of advice.  The record does not support a finding that Ms. Gayner transmitted information that was both genuinely (a) not known to or readily ascertainable by ESC and (b) material to the terms of the negotiated EVA.  This failure is dispositive to the questions of transactional taint and dispositive/preclusion sanctions.

Terminating sanctions and issue preclusion sanctions are reserved for extreme circumstances of misconduct, bad faith, and prejudice, where no lesser remedy can adequately

United States District Court
Northern District of California

address the harm. *See ByteDance*, 759 F. Supp. 3d at 999; *R&R Sails*, 673 F.3d at 1247; *see also Anheuser-Busch*, 69 F.3d at 348 (listing "availability of less drastic sanctions" as a factor that must be weighed when considering dispositive sanctions). Dispositive sanctions are not warranted where, as here, there is no showing that the counterparty to the alleged transactional taint was actually or reasonably likely to have been prejudiced by alleged misconduct. *See, e.g.*, *Domingo v. Donahoe*, 2013 WL 12173925, at *3 (N.D. Cal. Mar. 27, 2013); *Marin v. Eidgahy*, 2012 WL 928250, at *11 (S.D. Cal. Mar. 19, 2012); *Jackson v. Cap. Mgmt. Servs., LP*, 2014 WL 12597808, at *5 (C.D. Cal. July 21, 2014); *U.S. v. Dunlavy*, 2021 WL 4318299, at *5 (E.D. Cal. 2021); *see also Anheuser-Busch*, 69 F.3d at 348. SIE has not shown prejudice by plausibly demonstrating that Ms. Gayner shared proprietary SIE information with ESC or that the information she provided likely impacted EVA negotiations in any concrete and traceable way. Without such a showing, the exceptional remedy of terminating or issue preclusion sanctions is not justified. ESC's breach of contract and related claims shall thus proceed.

**B.      Motion to Modify Protective Order**

ESC retained new counsel in early-2026 (Paul Steiner and Frank Sommers) who now move to modify the existing Protective Order. Motion to Modify PO (Dkt. 496). Steiner and Sommers represent ESC and Scarecrow not only in this federal action, but in several collateral proceedings too, including: (1) a malpractice action against Ms. Gayner in Marin County Superior Court, (2) a malpractice action against MABR in Orange County Superior Court, and (3) an action against Insomniac Games in the federal district court for the Central District of California, (4) two actions in Nevada against Chase Bank concerning alleged breaches of lending agreements, (5) an action against Devolver for alleged misrepresentation of intellectual property rights. Attorneys Steiner and Sommers represent that they will be involved in the instant action too.

The Motion to Modify the Protective Order relies on two distinct arguments. ***First***, ESC argues that attorneys Steiner and Sommers require access to the Gayner materials to prosecute the malpractice actions, which post-date the Protective Order and represent a changed circumstance not contemplated when the Protective Order was entered. *Id.* at 1–2, 6 ("The protective order creates an unconstitutional asymmetry where ESC — the alleged victim of attorney misconduct —

32

is bound by restrictions that the alleged wrongdoers claim do not apply to them."). ***Second***, ESC argues that the Protective Order's factual predicate is wrong, and that if the Court, through the OSC process, concludes that Ms. Gayner's advice did not constitute non-public information that materially advantaged ESC, the Protective Order's scope should be reduced or vacated accordingly. Reply iso Motion (Dkt. 513) at 6–10. In the alternative, if the Court declines to modify the Protective Order, ESC requests an opportunity to depose certain witnesses "to prove ESC taught Sony the Pin Program." Motion to Modify PO at 6. These witnesses include Karineh Khachatourian, Shelly Gayner, and Brian Miller. *Id.* ESC also seeks an order requiring SIE to produce any settlement or indemnification agreement between SIE and Ms. Gayner, arguing that it bears on her credibility and potential bias as a witness in the collateral proceedings. *Id.* at 14–15.

SIE opposes the motion. Opposition to Motion (Dkt. 510). SIE's primary argument is that the motion is a thinly veiled motion for reconsideration that fails to satisfy the applicable standard, because ESC has not identified newly discovered evidence, has not shown clear error, and has not demonstrated an intervening change in controlling law. *Id.* at 7–13. SIE further argues that modification of the Protective Order is unwarranted because ESC's new counsel are not purely "malpractice counsel" because they also serve as counsel in this federal action (and in the case of Steiner, as General Counsel for ESC), meaning any modification to the Protective Order that permits access to the Gayner materials would effectively circumvent the core purpose of the Protective Order as it relates to this case. *Id.* at 6, 14–15, 17–19. SIE also argues that it has a reliance interest in the current Protective Order, that the Protective Order functions as an evidentiary sanction rather than a standard discovery protective order, and that ESC unreasonably delayed in seeking this modification to a Protective Order entered in 2024. *Id.* at 14–25.

The Court **DENIES** ESC's motion **WITHOUT PREJUDICE**. The Protective Order's core purpose was to prevent Ms. Gayner's insider knowledge of SIE's litigation strategy and privileged information from flowing back into this case through counsel. Permitting counsel who are simultaneously litigating this case along with others to access the Gayner materials, on the theory that they are operating independently in the malpractice proceedings, risks creating precisely the cross-contamination the Protective Order was designed to prevent. If ESC believes it

33

requires access to the Gayner materials for the purposes of the malpractice litigation, the appropriate mechanism is to retain counsel in those proceedings who are not also active in this federal action and who can therefore access those materials without implicating the Protective Order's purpose.

With respect to the Court's finding of no transactional taint, this conclusion does not mean that the Protective Order is no longer necessary. The Disqualification Order's underlying findings remain intact with respect to litigation taint. The Disqualification Order was based on litigation taint, specifically Ms. Gayner's improper collaboration with MABR in drafting the 2020 Gayner Declaration and her sustained involvement in active litigation strategy for a party adverse to her former client. Disqualification Order (Dkt. 335) at 14–18. The Protective Order followed from that ruling and should be understood as coextensive to it. The Protective Order continues to serve a necessary purpose with respect to litigation taint materials.

The Protective Order's scope extends to materials bearing on Ms. Gayner's involvement in the active litigation, including the Gayner Declaration and related litigation-facing communications, but it is not intended to encompass materials relating solely to her transactional advice to ESC during the EVA negotiation period, to the extent those materials can be separated from the litigation taint materials. The parties are therefore directed to meet and confer with the purpose of identifying, to the extent possible, which Gayner documents relate to transactional advice and which materials relate to Ms. Gayner's involvement in the litigation. The parties shall endeavor in good faith to reach an agreement on how documents are to be used going forward. The Court reserves the right to consider evidentiary sanctions if appropriate. The Court will schedule a case management conference to receive a status report on the parties' agreement on how to proceed. ESC's request for additional depositions and for production of SIE-Gayner settlement or indemnification agreements is also **DENIED WITHOUT PREJUDICE** and may be renewed, if appropriate. The Court's clarification of the Protective Order's scope does not address, and should not be construed to resolve, any privilege questions over specific Gayner documents. Any privilege disputes over specific documents identified in the parties' meet-and-confer process may be presented to the Court if they cannot be resolved by agreement between the

34

parties.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that terminating or issue preclusion sanctions against ESC are not warranted, and ESC is thus not precluded from asserting its breach of contract claim against SIE herein. The Court also **DENIES** ESC's Motion to Modify Protective Order **WITHOUT PREJUDICE**.

**IT IS SO ORDERED**.

Dated: May 14, 2026

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

35